# United States Court of Appeals
## For the First Circuit

No. 10-1112

UNITED STATES,

Appellee,

v.

SERGE ERIC BAYARD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Torruella, Stahl and Howard,
Circuit Judges.

James M. Fox for appellant.
Donald Feith, Assistant United States Attorney, with whom John
P. Kacavas, United States Attorney, was on brief, for appellee.

April 15, 2011

**HOWARD**, <u>Circuit Judge</u>.  A jury convicted Serge Bayard of use of an unauthorized access device, 18 U.S.C. § 1029(a)(2) (2006), and aggravated identity theft, 18 U.S.C. § 1028A (2006). On appeal he presses a litany of challenges, some counseled and others pro se, for the purpose of obtaining a new trial.  We affirm his conviction.

## I.  BACKGROUND

A friendship blossomed between Bayard and Dorothy Shovan, an elderly widow more than thirty years his senior, shortly after the death of her husband.  A few years later, Bayard moved into Shovan's home; in exchange for room and board, Bayard helped her around the house.  Bayard's responsibilities increased over time. By 2004, he was Shovan's driver, repairman, grocery shopper and, as her health waned, full-time caretaker.  Some of these tasks required monetary outlays and, although the precise nature of their financial arrangement is unclear, it appears that Bayard used her credit cards.  One of those credit cards -- a Bank of America Visa card (the "BofA Card") -- is at the center of this case.

On July 25, 2008, after several months of hospitalization and severe dementia, Shovan died.  At some point in August 2008, Bank of America -- unaware of Shovan's demise -- re-issued the BofA Card, which was scheduled to expire around that time.  Bayard, who was still living in Shovan's home, intercepted the re-issued BofA Card and used it to make several purchases at a Wal-Mart store

totaling about $185. That same day, he used the account number on the BofA Card to book a three-month trip to a resort in New Zealand. In e-mail correspondence, Bayard told a resort representative that he wanted to pre-pay using a credit card that belonged to his "cousin," who Bayard identified in a subsequent e-mail as Shovan. The representative agreed and charged Shovan's account nearly $3,000. Two weeks later, Bayard left for New Zealand. An attorney for Shovan's estate later discovered the curious account activity, cancelled the BofA Card, and notified authorities.

In early 2009, shortly after he returned from abroad, Bayard was arrested in connection with charges that do not pertain to this appeal. On April 10, 2009, while Bayard was detained and awaiting trial in state court, the government filed a criminal complaint against him in federal court. A two-count indictment, handed up on April 29, 2009, charged him with use of an unauthorized access device, 18 U.S.C. § 1029(a)(2),[1] and aggravated identity theft, 18 U.S.C. § 1028A.[2] On August 5, 2009, Bayard was

---

[1]Section 1029(a)(2) provides that "[w]hoever . . . knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period . . . shall, if the offense affects interstate or foreign commerce, be punished . . . ."

[2]Section 1028A(a)(1) provides that "[w]hoever, during and in relation to [a violation of section 1029(a)(2), among others], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to

released from state custody.  The next day he was arraigned in federal court, pled not guilty, and waived his right to counsel.

A two-day jury trial began in October.  Bayard represented himself for most of it, but midway through the second day his stand-by counsel stepped in at Bayard's request.  The focal point of trial was Bayard's authorization vel non to use the BofA Card after Shovan's death.  The government elicited testimony that Shovan was the only authorized user on the account; Bayard had no power of attorney over Shovan's financial affairs; and even if she had informally authorized Bayard to use the BofA Card, that authorization was only for her benefit and expired upon her death.  Bayard testified that Shovan specifically authorized him to use the BofA Card as well as her other credit cards, not only for her benefit but also for his.  He further testified that Shovan had bequeathed $20,000 to him, and that the transactions at issue were, in his view, advances on money owed.  After an afternoon of deliberation, the jury convicted Bayard on both counts in the indictment.  The court sentenced him to three years in prison.[3]  This appeal followed.

---

the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."

[3]Bayard does not appeal his sentence.

## II. DISCUSSION

We address each of Bayard's seven arguments in turn, adding background as necessary.

### A. <u>The J.P. Morgan Chase Card</u>

Before trial, the government moved in limine to admit evidence in its case-in-chief concerning a J.P. Morgan Chase credit card (the "Chase Card"). Bayard applied for the Chase Card in Shovan's name on June 23, 2008, when she was incapacitated, and -- as with the BofA Card -- used it after her death. According to the government, that evidence was probative of Bayard's intent and absence of mistake concerning his use of the BofA Card. The district court denied the government's motion on the grounds that Bayard's conduct in connection with the Chase Card was propensity evidence, <u>see</u> Fed. R. Evid. 404(b), and that its probative value was substantially outweighed by the risk of prejudice, <u>see</u> Fed. R. Evid. 403.[4] The court, however, left open the possibility that such evidence might be admissible later on for some other purpose.

During trial, Bayard took the stand and testified that Shovan specifically authorized him to use her credit cards. On cross-examination, the government began to question Bayard about the Chase Card. That prompted Bayard's stand-by counsel, who by this time had stepped in, to request a sidebar conference. There he objected on Rule 404(b) grounds. The government responded that,

---

[4]The government does not challenge this ruling on appeal.

although the court previously had denied its motion in limine on that basis, a limited line of questioning on cross-examination was permissible under Federal Rule of Evidence 608(b), because it sought only to impeach Bayard's credibility. The court agreed with the government, adding that in this context the value of the government's proposed inquiry outweighed any possible prejudice that might result. Bayard declined a limiting instruction and the sidebar concluded. The government then continued with cross-examination.

On appeal, Bayard repeats his objection that any testimony about the Chase Card violated Rule 404(b). His refrain is misguided. By its very terms, Rule 404(b) prohibits the admission of a prior bad act "to prove the character of a person in order to show conformity therewith." See, e.g., United States v. Landry, 631 F.3d 597, 601 (1st Cir. 2011) ("[Rule 404(b)] prohibits the admission of prior bad acts to establish an individual's character or propensity to commit a crime."). But here the government sought to cross-examine Bayard for the limited purpose of attacking his character for truthfulness. That is a different purpose that invokes a different rule. Compare Fed. R. Evid. 404(b), with Fed. R. Evid. 608(b). See generally United States v. Simonelli, 237 F.3d 19, 22-24 (1st Cir. 2001) (discussing interplay between Rules 404 and 608; explaining that the latter "'is centrally concerned with character for veracity, a mode of

-6-

accrediting or discrediting the witness that is based on the same 'propensity' reasoning of Rule 404 but is subject to quite different rules.'" (quoting United States v. Cudlitz, 72 F.3d 992, 996 (1st Cir. 1996) (internal brackets omitted))).

Whether Bayard's actions in connection with the Chase Card were fair game under Rule 608(b) is a separate question. The government says that such questions are left to the discretion of the trial court -- a proposition that may be correct but not necessarily dispositive here. Bayard says nothing at all. Although the applicability of Rule 608(b) to this line of questioning is less than clear, Bayard's failure to brief the issue waives it. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

That leaves us with Rule 403's balancing test, which Bayard does make some attempt to address in his brief. Rule 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." We have characterized Rule 403 judgments as "battlefield determinations" subject to "great deference." United States v. Shinderman, 515 F.3d 5, 17 (1st Cir. 2008). "Only rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair

effect." Id. (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)).

We discern no abuse of discretion here. Bayard does not adequately explain why his conduct surrounding the Chase Card was not probative of his credibility, so we assume without deciding that it was. He does argue that the risk of unfair prejudice was high, but we disagree. Our review of the government's cross-examination reveals that it was far from inflammatory. It was also quite short and limited in scope to what the government had proposed at the sidebar. And, as noted, Bayard declined the district court's offer to give a limiting instruction. See Shinderman, 515 F.3d at 17 ("Furthermore, the court offered to give a limiting instruction; that the defendant eschewed this course does not minimize the value of the court's offer."). Given these circumstances, we are reluctant to second-guess the district court's judgment in allowing cross-examination to proceed.

### B. The CitiBank MasterCard

During its case-in-chief, the government called Jeffrey Ramos, a custodian of records for Bank of America. Among other things, Ramos authenticated account statements provided by Bank of America that reflected charges to the BofA Card. Two of those charges, in addition to those described earlier, were balance transfers from a CitiBank MasterCard (the "CitiBank Card"), which was yet another of Shovan's credit cards that Bayard apparently

-8-

used after her death.  On direct examination, the government asked Ramos a series of questions concerning those transfers.  Based on certain questions Bayard posed on cross, the government sought on re-direct to clarify Ramos's testimony by referencing a corresponding set of account statements provided by CitiBank.

Bayard objected on the basis that he never received copies of the CitiBank records.  The government explained that Bayard had received copies and that they had been marked as an exhibit, although the exhibit was not yet in evidence.  The trial judge voiced his concern over questioning Ramos about an exhibit that was not in evidence and that he could not authenticate.  The government ultimately proposed to introduce the CitiBank records by means of a certification, and then conduct its examination of Ramos.  The court then admitted the CitiBank records over Bayard's relevancy objection.

On appeal, Bayard argues that the prosecutor's questions on re-direct concerning the CitiBank Card amounted to prosecutorial misconduct.  According to Bayard, the prosecutor "testified through his questions that there was another card which was allegedly obtained through improper means."  Bayard did not object on that ground at trial, so our review is for plain error.  United States v. Sánchez-Berríos, 424 F.3d 65, 73-74 (1st Cir. 2005).

We see no error, plain or otherwise.  Bayard does not identify in his brief the specific questions that he challenges,

but our independent review of the trial transcript satisfies us that his hypothesis is unfounded. None of the prosecutor's questions on re-direct gives us pause, let alone rises to the level where, in rare cases, we have ordered a new trial. See, e.g., United States v. Hardy, 37 F.3d 753, 757 (1st Cir. 1994) (vacating conviction where the prosecutor drew an analogy between the defendant's running and hiding from police on the night of the crime, and running and hiding again at trial by invoking Fifth Amendment right not to testify); United States v. Manning, 23 F.3d 570, 573 (1st Cir. 1994) (vacating conviction where the prosecutor suggested that government witnesses cannot lie and urged jury to "[t]ake responsibility for your community" by convicting the defendant); United States v. Arrieta-Agressot, 3 F.3d 525, 527 (1st Cir. 1993) (vacating convictions where the prosecutor urged the jury to consider case as a battle in war against drugs, and the defendants as enemy soldiers corrupting "our society").

Separately, Bayard hints in his brief that the prosecutor's questions provided an improper "shortcut" for the admission of the CitiBank records. If that cryptic remark is meant to challenge the admission of the Citibank records, presumably on Rule 404(b) grounds, the argument is woefully underdeveloped, and thus waived. Zannino, 895 F.2d at 17. Even if it were not waived, Bayard's failure to object on that ground below would subject the argument to plain error review, and under that standard it would

-10-

certainly fail.  See Sánchez-Berríos, 424 F.3d at 73 ("[U]nder plain error review, we have leeway to correct only the most egregious of unpreserved errors.").

## C.  **The Jury Instructions**

During the charge conference, there was considerable debate as to the identity of the access device in this case.  The government, pointing to the broad statutory definition of "access device," said that it was the plastic BofA Card itself (either the expired or re-issued version), the account number embossed on the plastic, and the Bank of America account to which the card was linked.  See 18 U.S.C. § 1029(e)(1).[5]  Bayard's counsel took a much narrower view.  He argued that the government must show that Bayard used an "unauthorized access device," id. § 1029(a)(2) (emphasis supplied), which is an access device that was "lost, stolen, expired, revoked, cancelled, or obtained with intent to defraud," id. § 1029(e)(3).  According to him, evidence adduced at trial established that Shovan authorized Bayard to use the (by then expired) BofA Card, along with its number and associated account, both of which remained unchanged since the time Bayard was

---

[5]Defining "access device" as "any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)."

-11-

authorized to use them.  Thus, he posited that the only access device that the government could argue was "unauthorized" was the re-issued plastic BofA Card, on the theory that it was "stolen" or fraudulently "obtained" when Bayard intercepted it in August 2008.[6]

The court agreed with Bayard that, under the rather unique circumstances of this case, only the re-issued plastic BofA Card -- and not its account or account number -- was arguably "unauthorized."  Based on that understanding, the court delivered the following instruction over the government's objection:

> The term "access device" means any card, plate, code, account number, or other means of account access that can be used alone or in conjunction with another access device to obtain money, goods, services or any other thing of value, or that can be used to initiate a transfer of funds other than a transfer originated solely by paper instrument.  In this case, the access device alleged to be unauthorized is the credit card issued in August of 2008 ending in account number [supplied].
>
> The term "unauthorized access device" includes any credit card that was either stolen or obtained with the intent to defraud.  In this case the government claims that the defendant stole and/or obtained with the intent to defraud the Bank of America Visa card, last four

---

[6]This was important because the bulk of Bayard's transactions, including his New Zealand booking and CitiBank balance transfers, were executed online or over the phone using only the account or account number.  Under Bayard's hypothesis, those transactions did not violate the statute because he did not physically "swipe" the plastic BofA Card.  See 18 U.S.C. § 1029(a)(2) (prohibiting "use" of an "unauthorized access device").  Although he did swipe the card at Wal-Mart, the amount of his purchases there fell below the statutory threshold.  See id. (imposing liability on purchases of "value aggregating $1,000 or more" during any one-year period).

We do not address these contentions head-on, however, because Bayard has not appealed the denial of his motion for judgment of acquittal.

-12-

digits [supplied], that had been issued to Dorothy Shovan. Accordingly, the government must prove beyond a reasonable doubt either that the defendant stole that credit card or that he obtained it with the intent to defraud.[7]

Having gotten what he requested, Bayard now assails the court's instruction as confusing. In particular, he argues that listing "account number" as among the possible access devices "created a serious risk that the jury would be confused as to whether an account number satisfied the statute." Because Bayard failed to object to the instruction as delivered, we review for plain error, Ji v. Bose Corp., 626 F.3d 116, 125 (1st Cir. 2010), and quickly dispatch his plaint. We see no likelihood of juror confusion, given the court's clear and repeated statements that the access device here was the re-issued plastic BofA Card. The phrase "account number" appears only in a list of what access devices could be in general. The court was free to include that list, which closely tracked the statute, for context. Cf. United States v. Alicea, 205 F.3d 480, 484 (1st Cir. 2000).

### D.  Remaining Arguments

We briefly address Bayard's four remaining claims raised in his supplemental pro se brief, and reject the lot.

---

[7]We wish to add that we take no position on the court's statutory interpretation that led to this instruction. Our precedent is unsettled and the answer is far from obvious. See, e.g., United States v. DiPietro, 936 F.2d 6, 7 & n.3 (1st Cir. 1991). We therefore save the question for another day.

-13-

Bayard argues that the district court should have dismissed the case on speedy trial grounds, because 116 days elapsed between the return date of the indictment and when he moved for dismissal.  But the critical date, for purposes of the Speedy Trial Act, was August 7, 2009, the day after he was arraigned in federal court.[8]  See 18 U.S.C. § 3161(c)(1) (2006) ("[T]rial . . . shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge in pending, whichever date last occurs." (emphasis supplied)); see also United States v. Muñoz-Amado, 182 F.3d 57, 60 (1st Cir. 1999) (rejecting argument in similar circumstances).  The period between that date and the start of Bayard's trial in October 2009 was well under seventy days.

Next, he asserts that the court denied his requests to subpoena four individuals, in violation of the Sixth Amendment.  See Fed. R. Crim. P. 17(b).  Not true.  The transcript from the ex parte hearing in which Bayard sought subpoenas reveals that he withdrew his requests for three of those four individuals.[9]  The judge took under advisement Bayard's request for the remaining

[8]Bayard specifically disavows any claim under the Sixth Amendment's Speedy Trial Clause.  See generally Barker v. Wingo, 407 U.S. 514 (1972).

[9]The government does not point this out in its brief.  It explains in a footnote that it was not present at the ex parte hearing and that a transcript was "not made available."

-14-

individual -- Tania Booth, the New Zealand resort representative -- although it appears that the court never ruled on that particular request. But at no point thereafter did Bayard ask the trial judge for an up-or-down ruling, so the issue has been waived. DesRosiers v. Moran, 949 F.2d 15, 22-23 (1st Cir. 1991). In any event, because Bayard's e-mail correspondence with Booth was admitted into the record, her testimony likely would have been cumulative.

Third, Bayard critiques the timing of the district court's ruling that precluded the government from using a prior conviction. According to Bayard, by waiting until the last day of trial to issue its ruling the court "interfered" with his "tactical decisions," including his decision to proceed pro se. If the court had ruled earlier, Bayard contends, he would have retained counsel for the entire trial. We think not. Bayard never indicated below, in extensive discussions on the matter, that his decision to proceed pro se hinged on an evidentiary ruling. Moreover, the record reveals that Bayard asked his stand-by counsel to step in before the court ruled on the admissibility of his prior conviction, fatally undermining his claim.

Lastly, Bayard argues that the cumulative effect of the district court's errors necessitates a new trial. See United States v. Gonzalez-Melendez, 594 F.3d 28, 37 (1st Cir. 2010)

(discussing the so-called cumulative error doctrine).  But without any errors, there is nothing to accumulate.[10]

**Affirmed**.

---

[10]Bayard's counsel asserted at oral argument that the government did not satisfy its burden of showing intent to defraud. The argument comes too late, United States v. Poulin, 631 F.3d 17, 19 n.2 (1st Cir. 2011) (arguments raised at oral argument but not in a party's initial brief are considered waived), and anyway Bayard did not appeal the denial of his motion for judgment of acquittal, see supra note 6.