# United States Court of Appeals
## For the First Circuit

No. 16-1300

UNITED STATES OF AMERICA,

Appellee,

v.

RAÚL DOMÍNGUEZ-FIGUEROA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Lynch, Circuit Judges.

Heather Clark and Clark Law Office on brief for appellant.
Thomas F. Klumper, Assistant United States Attorney, Senior
Appellate Counsel, Mariana E. Bauzá-Almonte, Assistant United
States Attorney, Chief, Appellate Division, and Rosa Emilia
Rodríguez-Vélez, United States Attorney, on brief for appellee.

August 9, 2017

**LYNCH, Circuit Judge.** A jury convicted Raúl Domínguez-Figueroa of three charges stemming from a fraudulent scheme to obtain disability benefits from the Social Security Administration ("SSA"). He now appeals from both his convictions and his sentence. Finding no merit to his arguments, we affirm.

I.

Domínguez is a lifelong resident of Ciales, Puerto Rico and worked there from 1993 until 2010 as a welder for Thermo King, a manufacturer of refrigeration units for tractor-trailers. Between April 2008 and January 2009, Thermo King closed its Ciales plant and transferred all the plant's employees, including Domínguez, to a different plant in Arecibo, Puerto Rico. On November 3, 2010, Domínguez submitted a written resignation letter, which cited transportation problems as his reason for resigning.

On February 8, 2011, Domínguez first visited Dr. Luis Escabí-Pérez ("Dr. Escabí"), a psychiatrist, who had previously worked as an SSA claims examiner -- and who would ultimately become Domínguez's co-defendant in this prosecution. According to Dr. Escabí's trial testimony,[1] Domínguez showed symptoms consistent with mild to moderate depression, not severe enough to prevent him from working. Claimants are entitled to SSA disability benefits

_____

[1] Pursuant to a plea agreement, Dr. Escabí agreed to testify at Domínguez's trial.

only if their disability is so severe that they cannot work.  See 42 U.S.C. § 423(d).

Nevertheless, Dr. Escabí further testified, he agreed to help Domínguez obtain SSA disability benefits by (1) backdating his first appointment to December 9, 2010; (2) exaggerating Domínguez's symptoms, diagnosing him with severe depression, and prescribing unnecessarily strong medications; and (3) scheduling unnecessary monthly appointments until the SSA approved Domínguez's application for benefits.  Dr. Escabí knew, based in part on his experience as an SSA claims examiner, that these actions would help Domínguez obtain SSA approval for disability benefits to which Domínguez was not entitled.[2]

On May 20, 2011, Domínguez applied for SSA disability benefits via telephone.  The SSA claims representative advised Domínguez several times that the application was being submitted under penalty of perjury.  Domínguez told the representative that his disabling depression had begun on December 9, 2010, and that it had caused him to stop working.  In July 2011, he mailed an Adult Function Report to the SSA, using template answers provided by Dr. Escabí that exaggerated Domínguez's true condition.  On July 24, 2011, Dr. Escabí submitted a Psychiatric Medical Report

---

[2]    Dr. Escabí's former secretary, in her own testimony at Domínguez's trial, recalled that nearly all of Dr. Escabí's patients between 2010 and 2013 were seeking Dr. Escabí's help in obtaining SSA disability benefits through fraud.

- 3 -

to the SSA, in which he, too, exaggerated the severity of Domínguez's condition. Based on all this information, Domínguez was approved for SSA disability benefits on February 28, 2012, with a disability onset date of December 9, 2010. He was awarded a retroactive payment of $10,437 and prospective monthly payments of $1,187.

In September and October 2014, SSA officers conducted surveillance of Domínguez and interviewed him. Their investigation revealed that Domínguez had few or no symptoms of the severe depression he and Dr. Escabí had continued to report to the SSA: for example, he could interact and converse normally with others, drive a car, carry out simple chores, be outside alone, and withstand noise. SSA officers also visited Domínguez's Facebook page and printed out several photos, all uploaded at times when Domínguez had told the SSA he was disabled. The photos, some of which depicted Domínguez socializing with others, reinforced the officers' suspicion that he and Dr. Escabí had been misrepresenting the severity of his depression.

On January 13, 2015, Domínguez and Dr. Escabí were jointly indicted. The counts against Domínguez included conspiring to defraud the United States (Count One), see 18 U.S.C. § 371, stealing government property (Count Three), see id. § 641, and making material false statements in an application for disability benefits (Count Five), see 42 U.S.C. § 408(a)(2). After

an eight-day trial, in which Dr. Escabí testified as a government witness, the jury found Domínguez guilty on Counts One, Three, and Five, and found that the total amount of wrongfully obtained disability payments was $87,268.

The district court sentenced Domínguez to ten months of imprisonment and three years of supervised release, to be served concurrently on all three counts, and ordered him to pay $87,268 in restitution. Domínguez did not object to the sentence.

II.

As to his convictions, Domínguez argues that there was insufficient evidence to support the jury's verdict and that it was error to admit the Facebook printouts into evidence at trial. Neither argument has merit.

A.  Sufficiency of the Evidence

We review de novo Domínguez's preserved challenge to the sufficiency of the evidence supporting his convictions. See United States v. George, 841 F.3d 55, 61 (1st Cir. 2016). Viewing the evidence in the light most favorable to the government "and taking all reasonable inferences in its favor," we ask whether "a rational [jury] could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." Id. (quoting United States v. Chiaradio, 684 F.3d 265, 281 (1st Cir. 2012)).

Domínguez claims that no rational jury could have concluded that he possessed the mens rea associated with each of the three crimes. Specifically, he argues that there was insufficient evidence that he had the requisite specific intent to participate in the conspiracy to defraud the SSA (Count One) or to steal government funds to which he knew he was not entitled (Count Three), and that there was insufficient evidence that he knew his false statement to the SSA was false (Count Five).

A rational jury could easily have concluded that Domínguez knowingly committed each of his crimes. His "culpable state of mind can be readily gleaned from 'several strands of circumstantial evidence' presented at trial." United States v. Troisi, 849 F.3d 490, 494 (1st Cir. 2017) (quoting United States v. Vega, 813 F.3d 386, 398 (1st Cir. 2016)). The jury was entitled to credit Dr. Escabí's testimony that Domínguez was a knowing participant in the scheme, see United States v. Patel, 370 F.3d 108, 112 & n.2 (1st Cir. 2004), and to "rely on plausible inferences" drawn from the combination of that testimony and the government's other evidence, Vega, 813 F.3d at 398 (quoting United States v. Matthews, 498 F.3d 25, 31 (1st Cir. 2007)). Indeed, the government provided ample corroboration for Dr. Escabí's testimony about Domínguez's criminal intent, including the fraudulent Adult Function Report, which Domínguez completed himself, and the photos and testimony tending to show that Domínguez was minimally impaired

-- or not impaired at all -- while receiving SSA payments.  Viewed together, these strands of evidence justified a compelling inference that Domínguez was a knowing participant in the fraudulent scheme, not an innocent bystander.  See Troisi, 849 F.3d at 495-96 (holding that defendant's actions "'create[d] a strong inference that she did not care' [about the scheme's illegality] and that she therefore 'not only knew of the fraud, but actively played a role in directing it'" (quoting Vega, 813 F.3d at 399)).

B.    Admissibility of Facebook Printouts

Domínguez also argues that the district court erred by admitting the Facebook printouts into evidence.  Because the government knew only when the photos had been uploaded to Facebook, not when they had been taken, he argues that the printouts were irrelevant, see Fed. R. Evid. 401, 402, or that their "probative value [wa]s substantially outweighed by a danger of . . . unfair prejudice," Fed. R. Evid. 403.  We review these claims of evidentiary error for abuse of discretion, mindful of the fact that a district court's Rule 403 balancing is "subject to great deference" on appeal.  United States v. Jones, 689 F.3d 12, 21 (1st Cir. 2012) (quoting United States v. Bayard, 642 F.3d 59, 63 (1st Cir. 2011)).

There is no doubt that the printouts were relevant.  The images "d[id] not compel, but clearly permit[ted], an inference"

- 7 -

that Domínguez was much healthier and more active during the relevant years than he had led the SSA to believe. Id. The fact that the government could not provide an exact date for the photos was for the jury to weigh. As for Rule 403, Domínguez fails to explain how the evidence caused him any unfair prejudice at all. The printouts "were prejudicial only in the sense that they were damaging" to Domínguez's defense; such damage "is not 'prejudice' within the meaning of Rule 403." United States v. Pérez-González, 445 F.3d 39, 47 (1st Cir. 2006).[3]

Moreover, any error in admitting the Facebook printouts was harmless. The jury had ample evidence of Domínguez's guilt, with or without the printouts, so "it is highly probable that the [purported] error [in admitting the printouts] did not influence the verdict." United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005) (quoting United States v. Piper, 298 F.3d 47, 56 (1st Cir. 2002)).

III.

Domínguez also raises two challenges to his sentence. He made neither objection at sentencing, and so "he faces the

---

[3] We also reject Domínguez's argument, made for the first time on appeal, that a Facebook comment by Miralles Domínguez-Cely, included on one of the printouts, was inadmissible hearsay. The comment was not hearsay at all: the government offered it to provide context and timing for the accompanying photo, not "to prove the truth of the matter asserted" in the comment. Fed. R. Evid. 801(c)(2).

'heavy burden' of plain-error review."  United States v. Delgado-López, 837 F.3d 131, 134 (1st Cir. 2016) (quoting United States v. Ramos-Mejía, 721 F.3d 12, 14 (1st Cir. 2013)).  We discern no error, much less plain error.[4]

A.    Explanation of Supervised Release Term

Domínguez first argues that the district court procedurally erred by failing to explain why it imposed a supervised release term at the high end of the applicable Guidelines range, despite imposing a prison term at the low end of the applicable Guidelines range.  See 18 U.S.C. § 3553(c) ("The court . . . shall state in open court the reasons for its imposition of the particular sentence . . . .");  id. § 3583(c) (instructing sentencing judges to consider specified § 3553(a) factors before imposing a supervised release term).

The explanation was adequate.  The judge confirmed that he had considered the § 3553(a) factors, "a statement [that] is entitled to significant weight," United States v. Santiago-Rivera, 744 F.3d 229, 233 (1st Cir. 2014), and he identified the specific factors that he deemed most relevant, given the facts of Domínguez's case.  That explanation sufficed for both the prison term and the supervised release term, which serve distinct

---

[4]    Because the arguments are meritless, we need not decide whether Domínguez waived them or merely forfeited them.  See Delgado-López, 837 F.3d at 135 n.2.

- 9 -

purposes, see United States v. Johnson, 529 U.S. 53, 59–60 (2000), but are two components of a single sentence. We agree with the Seventh Circuit that "[n]o part of § 3553(c) requires the district court to bifurcate its consideration, discussion, and evaluation of the § 3553(a) sentencing factors" whenever the court chooses to impose a sentence that includes both an imprisonment component and a supervised release component. United States v. Bloch, 825 F.3d 862, 869 (7th Cir. 2016).[5]

Moreover, the court's rationale is easily inferred from the record. Domínguez's counsel argued for a sentence with a shorter prison term and a longer supervised release term, and the court evidently agreed. See United States v. Murphy-Cordero, 715 F.3d 398, 401–02 (1st Cir. 2013) (explaining that judge's reasoning "can often be inferred by comparing what was argued by the parties or contained in the presentence report with what the judge did"

---

[5]    Domínguez identifies no authority supporting his theory that separate explanations are required whenever a district court imposes a sentence involving both imprisonment and supervised release. The Seventh Circuit is just one of several that have rejected the theory. See United States v. Aplicano-Oyuela, 792 F.3d 416, 425 (4th Cir. 2015) (rejecting procedural unreasonableness challenge to supervised release term and holding that a "court's sentencing rationale . . . can support both imprisonment and supervised release"); United States v. Oswald, 576 F. App'x 34, 35 (2d Cir. 2014) (unpublished summary order) (same); United States v. Clark, 726 F.3d 496, 501–03 (3d Cir. 2013) (same); United States v. Penn, 601 F.3d 1007, 1011–12 (10th Cir. 2010) (same); United States v. Presto, 498 F.3d 415, 419 (6th Cir. 2007) (same).

(quoting United States v. Dávila-González, 595 F.3d 42, 48 (1st Cir. 2010))).

B.   Lump-Sum Restitution Payment

Domínguez also argues that the district court erred by requiring him to pay restitution in a lump sum, despite the court's finding that he was unable to pay a fine.  This argument, too, is meritless.  The record shows that the court met its obligation to consider Domínguez's financial condition.  See United States v. Salas-Fernández, 620 F.3d 45, 49 (1st Cir. 2010) (citing 18 U.S.C. § 3664(f)(2)).  And because "impoverishment today is no assurance of future poverty," it was not error "to take into account [Domínguez's] future earning capacity." Id. (citation omitted).

Should Domínguez prove unable to meet his payment obligations, he or the probation office may ask the district court either to set a payment plan or to modify the restitution component of the judgment.[6]  See 18 U.S.C. § 3583(e)(2); United States v. de Jesús, 831 F.3d 39, 44 n.4 (1st Cir. 2016); United States v. Lilly, 80 F.3d 24, 29 (1st Cir. 1996).

IV.

We affirm Domínguez's convictions and sentence.

---

[6]   Modification may be necessary in any event, as the government points out, because the judgment is internally inconsistent as to the amount of restitution owed.