# United States Court of Appeals
## For the First Circuit

No. 17-1879

UNITED STATES OF AMERICA,

Appellee,

v.

RODOLFO VÁZQUEZ-SOTO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, Chief U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Jessica E. Earl, Research and Writing Specialist, with whom Eric Alexander Vos, Federal Public Defender, and Vivianne M. Marrero, Assistant Federal Public Defender, Supervisor, Appeals Section, were on brief, for appellant.

Francisco A. Besosa-Martínez, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

October 1, 2019

**LIPEZ**, **Circuit Judge**.  After a six-day trial and four days of deliberation, a jury convicted appellant Rodolfo Vázquez-Soto on two counts of making false statements and one count of theft of government property.  See 18 U.S.C. §§ 1001, 641, 2.  The district court sentenced him to five years' probation and ordered him to pay restitution in the amount of $19,340.79.  Vázquez-Soto appeals his convictions on all counts, arguing that the district court (1) erred in denying his motion for a judgment of acquittal because the evidence was insufficient to sustain his convictions; (2) abused its discretion in admitting into evidence photographs taken from a Facebook page under the name of his ex-wife; and (3) further abused its discretion when it declined to provide the jury with the transcript of certain witness testimony and did not inform the jury that it could request a readback of the testimony.  We conclude that sufficient evidence supported Vázquez-Soto's convictions, and that the district court did not abuse its discretion in allowing admission of the challenged Facebook photos despite an authentication objection or in its response to the jury's request for a transcript.  Accordingly, we affirm.

**I.**

**A. Factual Background**

"Because this appeal pertains, in part, to the Defendant['s] motion[] for acquittal before the district court, we recount the facts here in the light most favorable to the

- 2 -

government."  United States v. Fernández-Jorge, 894 F.3d 36, 41 (1st Cir. 2018) (internal quotation marks omitted).  Vázquez-Soto was a mail carrier for the United States Postal Service ("USPS") with a long history, supposedly, of back problems for which he received substantial disability benefit payments for many years. His problems began in 1989 when he suffered a back injury while lifting a heavy tray at work.  He filed a claim with the Department of Labor's Office of Workers' Compensation Programs ("OWC"), supported by medical documentation of the injury and a recommendation of physical therapy.  The OWC accepted the claim and granted him forty-five days of paid leave.

Following his return to work, Vázquez-Soto was granted limited work duty and accommodations for his back pain.  For the next nine years, Vázquez-Soto worked for the USPS with limited duty assignments.  He was annually examined by a physician, Luis Faura-Clavell ("Dr. Faura"), and, each year, he submitted the requisite OWC paperwork documenting his continuing need for a limited duty assignment.[1]  Then, in 1998, he filed a recurrence claim, asserting that his original condition had worsened.  He was evaluated by two

---

[1]  To receive disability benefits, an injured government employee must "submit to examination by a medical officer of the United States . . . after the injury and as frequently and at the times and places as may be reasonably required."  5 U.S.C. § 8123(a).

doctors, selected by the OWC, and each recommended that he could continue working with a reduced schedule and accommodations.

The next year, Vázquez-Soto filed another recurrence claim, again asserting that his condition had worsened. In April 1999, he was examined by Dr. Faura, who reported him as totally disabled and incapable of even limited duty work. Dr. Faura submitted the requisite OWC paperwork stating that Vázquez-Soto was totally disabled and recommending retirement. Although the OWC initially rejected Vázquez-Soto's claim of total disability, it reversed its position in 2001, and accepted the claim retroactively to April 1999. Accordingly, it paid Vázquez-Soto total disability payments from the date of Dr. Faura's April 1999 letter, and determined that he would be paid full disability benefits going forward.

For over a decade, Vázquez-Soto filed annual claims of total disability, Dr. Faura submitted supporting documentation, and Vázquez-Soto collected disability payments. In 2012, the USPS Office of Inspector General began investigating those claims for possible fraud. As part of the investigation, the OWC instructed Vázquez-Soto to report to a new doctor, Fernando Rojas-Díaz ("Dr. Rojas"), for a second medical opinion. After examining Vázquez-Soto in February 2013, Dr. Rojas reported inconsistencies between Vázquez-Soto's apparent physical condition and his clinical complaints. The doctor concluded that, although Vázquez-Soto was

disabled, he was capable of returning to his "date-of-injury [] job but with restrictions."

The investigating agent assigned to Vázquez-Soto's case also examined his compensation history and found that, although Vázquez-Soto had received $448,000 in benefits, his medical expenses only totaled $8,000. The agent then coordinated video surveillance of Vázquez-Soto to be conducted by FBI agents and local agents at Vázquez-Soto's home and other locations. The surveillance team captured video footage of Vázquez-Soto carrying a large picture frame from his car into a building, riding a motorcycle while wearing a heavy helmet and carrying a satchel, driving a car, and walking and maneuvering his neck, arms, and shoulders with ease.

Additionally, an undercover special agent, Cassandra Cline, posed as an OWC representative and summoned Vázquez-Soto for a "Current Capacity Evaluation," also called a "rehab interview." During the interview, Vázquez-Soto attested to his inability to work or drive a car for more than an hour, and his total disability.

Following the investigation, Vázquez-Soto was charged with four counts of making false statements in violation of 18 U.S.C. § 1001 (Counts I to IV) and one count of theft of government property in violation of 18 U.S.C. §§ 641 and 2 (Count V). Counts II and III were subsequently dismissed by the

government, and Vázquez-Soto proceeded to trial on Counts I, IV, and V.

**B. The Trial**

At trial, the government called a series of law enforcement agents and OWC representatives to testify about the fraud investigation. The government also produced as evidence surveillance videos, video of the undercover rehab interview, and government documents, spanning many years, signed by Vázquez-Soto and attesting to his inability to work.

One of the investigating agents, José Morales, testified about digital photographs that he downloaded from a Facebook page bearing the name of Vázquez-Soto's ex-wife, Carmen Rosa Janica. Morales explained that he found the photographs when he conducted an online "inquiry" concerning Vázquez-Soto. In conducting that inquiry, the agent searched for Janica on social media websites, including Facebook, and found a Facebook page under her name. On that page, Morales discovered a series of digital photograph albums, uploaded in 2010, that depicted Vázquez-Soto traveling in Colombia. When he looked through these albums, he recognized Vázquez-Soto[2] and downloaded the photographs, which he kept on his computer until the trial.

---

[2] Morales correctly identified Vázquez-Soto at trial.

Though the photographs were uploaded to Facebook in 2010, one had a 2008 date stamp. The others were not dated. The photographs show, inter alia: (1) Vázquez-Soto and a woman dressed in motorcycle club T-shirts standing in front of a group of motorcycles; (2) Vázquez-Soto standing among a large group of people dressed in motorcycle club T-shirts (with a date stamp of 12/21/08 on the photograph); (3) Vázquez-Soto among a group of people, each wearing a motorcycle helmet and standing next to a motorcycle; (4) Vázquez-Soto and another person on a motorcycle, each wearing a helmet; (5) Vázquez-Soto seated on a motorcycle in front of a large body of water; (6) Vázquez-Soto wearing a life-jacket standing in front of palm trees and what looks like a river; (7) Vázquez-Soto entering a paddle boat; (8) Vázquez-Soto standing in front of a waterfall; (9) Vázquez-Soto and a woman doing what appears to be dancing; and (10) Vázquez-Soto standing behind a motorcycle. Defense counsel objected to the introduction of these photographs as irrelevant, prejudicial, and not properly authenticated. The court noted the objection but admitted the photographs into evidence.

The government also called as witnesses Dr. Faura and Dr. Rojas, who each testified about his prior examination of Vázquez-Soto and whether his disability findings were consistent with the abilities demonstrated by Vázquez-Soto in the surveillance videos and in the photographs. Dr. Faura testified that "[i]f this

- 7 -

patient is driving a motorcycle, is wearing a helmet, is holding the motorcycle which is 400 pounds with his legs . . . he cannot be disabled."  Dr. Rojas -- when asked by the government, "how do you explain . . . [your finding that the defendant] had those disabilities and [] restrictions, [and] the videos that you're looking at and the pictures?" -- testified, "I was fooled."

The defense called, as its sole witness, Dr. Rafael E. Sein-Sierra ("Dr. Sein").  Dr. Sein testified that Vázquez-Soto has "limited functional physical capabilities" and that the surveillance videos did not change his assessment.  He based his testimony on a medical report, admitted into evidence, that he authored about Vázquez-Soto's medical condition.  Dr. Sein explained that he concluded in his report that Vázquez-Soto's condition is permanent and likely to worsen over time.  Dr. Sein's testimony lasted more than an hour and was followed by cross-, redirect-, and re-cross-examination.  After the re-cross, Vázquez-Soto moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, which the court denied.

The jury deliberated for four days.  At the end of the first day of deliberations, the jury requested a transcript of the testimony of Dr. Sein.  The district court denied the request, over defense counsel's objection.  The court also denied defense counsel's request for a "readback" of Dr. Sein's testimony and counsel's request that the jury be informed that it could request

such a readback.  Instead, the court instructed the jurors to rely on their memory, notes, and Dr. Sein's report.[3]  On the fourth day of deliberations, the jury returned a verdict of guilty on all three counts.  Vázquez-Soto then renewed his Rule 29 motion and moved for a new trial under Rule 33, see Fed. R. Crim. P. 29(c), 33, which the court denied.  This appeal followed.

On appeal, Vázquez-Soto argues that (1) the evidence introduced at trial was insufficient to support his convictions, (2) the Facebook photos should not have been admitted into evidence, and (3) the district court should have provided the jury with a transcript or readback of Dr. Sein's testimony, or, in the alternative, informed the jury that it could request a readback. We consider each argument in turn.

**II.**

We review a challenge to the sufficiency of the evidence de novo, taking the evidence in the light most favorable to the jury's verdict.  United States v. Santos-Soto, 799 F.3d 49, 56-57 (1st Cir. 2015).  "The verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime

---

[3] The sequence of events concerning the request for a transcript or readback is described in more detail in our analysis. See infra Section IV.

beyond a reasonable doubt."  United States v. Rodríguez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010).

## A. False Statements

To sustain a conviction for making false statements, the government must prove that the defendant (1) made a material, false statement (2) in a matter within the jurisdiction of the government (3) knowing that the statement was false.  See 18 U.S.C. § 1001; United States v. Notarantonio, 758 F.2d 777, 785 (1st Cir. 1985). Vázquez-Soto argues that his convictions on Counts I and IV, charging false statements in his 2013 disability benefits paperwork and in the rehab interview, respectively, must be vacated because the government failed to introduce enough evidence for a reasonable juror to conclude, beyond a reasonable doubt, that he knew that his statements of total disability were false.[4]  He argues that the evidence at trial showed that he "believed his doctors" and simply repeated their assessments in his paperwork and rehab interview.

Evidence of a defendant's culpable state of mind may be "gleaned from . . . circumstantial evidence presented at trial." United States v. Troisi, 849 F.3d 490, 494 (1st Cir. 2017) (internal quotation marks omitted).  Here, the jury saw video evidence of Vázquez-Soto engaged in strenuous activity, such as

---

[4] Vázquez-Soto does not challenge the sufficiency of the evidence as to any element of the false statements crimes other than knowledge.

carrying a large picture frame and riding a motorcycle, within days of his statements of total disability. The jury heard testimony from Vázquez-Soto's examining doctors that the video footage of Vázquez-Soto and the Facebook photographs were inconsistent with Vázquez-Soto's reports of debilitating pain. In addition, the jury heard the testimony of Agent Cline, who conducted the rehab interview. She testified that, during the interview, Vázquez-Soto conveyed "the impression . . . that he cannot move his neck," and stated that his daily activities were hampered by "muscle spasms." The jury could compare this testimony to the video footage, taken only days prior, which showed Vázquez-Soto wearing a heavy helmet and maneuvering his car and motorcycle with ease. From this evidence, the jury easily could have drawn the plausible inferences that Vázquez-Soto was exaggerating his experience of pain -- rather than merely repeating the diagnoses of his doctors -- and that, when he claimed to be totally disabled in his 2013 paperwork and rehab interview, he knew that his statements were false.

## B. Theft of Government Property

Vázquez-Soto's challenge to the sufficiency of the evidence as to Count V, charging theft of government property, fails for the same reasons. He again attacks the adequacy of the government's evidence as to knowledge, arguing that the government introduced no evidence from which a reasonable factfinder could

conclude that he knowingly accepted government benefits to which he was not entitled. See 18 U.S.C. § 641 (requiring knowledge).

The same evidence supporting a reasonable inference that he knew that his claims of total disability were false also supports a reasonable inference that he knew that he was not entitled to the government benefits that he accepted. As noted, the jury heard Dr. Rojas's testimony that Vázquez-Soto had "fooled" him, and Dr. Faura's testimony that Vázquez-Soto "[could not] be disabled" and ride a motorcycle with a heavy helmet. "The jury was entitled to credit [the doctors'] testimony" and "to rely on [the] plausible inferences drawn from the combination of that testimony and the government's other evidence," including the discrepancy between the amount of money that Vázquez-Soto accepted and the amount that he spent on medical care, and the photographs and video of him engaged in strenuous physical activity. United States v. Domínguez-Figueroa, 866 F.3d 481, 485 (1st Cir. 2017) (internal quotation marks omitted). Viewed in its totality, the government's evidence justified an inference that Vázquez-Soto intentionally overstated his impairment to his doctors and in his OWC paperwork to receive payments to which he knew he was not entitled.

**III.**

Vázquez-Soto argues that the district court erred by admitting the Facebook photographs. Because the government introduced no evidence that the Facebook page actually belonged to

Vázquez-Soto's ex-wife, and because it knew only when the photographs were uploaded to the Facebook page (2010), but not exactly when the photographs were taken, he asserts that the photographs were unauthenticated. See Fed. R. Evid. 901. He also contends that the photographs were irrelevant, see Fed. R. Evid. 401, 402, and unfairly prejudicial, see Fed. R. Evid. 403. We review these claims of evidentiary error for abuse of discretion. United States v. Pérez-González, 445 F.3d 39, 47 (1st Cir. 2006).

**A. Authentication**

"The test of authenticity is straightforward." United States v. Holmquist, 36 F.3d 154, 167 (1st Cir. 1994). "The standard the district court must apply in evaluating a[n] [item]'s authenticity is whether there is enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be." United States v. Blanchard, 867 F.3d 1, 6 (1st Cir. 2017) (internal quotation marks omitted); Fed. R. Evid. 901(a). This requirement may be met with various forms of evidence, including "[t]estimony that an item is what it is claimed to be" or evidence of "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(1),(4).

**1.  Social Media**

Vázquez-Soto argues that, because the photographs were found on a Facebook page, we must address the evidentiary rules for

"authenticating social media data," and that, under these rules, a proponent of social media evidence "must present a prima facie case . . . that [the social media evidence] is in fact a posting on a person's Facebook page," in this case the page of Janica, Vázquez-Soto's ex-wife. Without Janica's testimony that the photographs came from her Facebook page, or other evidence akin to it, Vázquez-Soto argues that the government failed to meet this requirement.

We disagree with the premise of Vázquez-Soto's argument. The authenticity of Janica's social media account is not at issue in this case -- that is, the account's ownership is not relevant. The photographs were introduced as images of Vázquez-Soto on a motorcycle trip, not as part of a social media statement by Janica. Thus, what is at issue is only the authenticity of the photographs, not the Facebook page.[5] And, as the Sixth Circuit has observed,

---

[5] Of course, there are cases in which ownership of a social media account would be relevant. For instance, if a Facebook user under the name Sally Smith posted a photograph of an empty vault with the caption "I robbed a bank," and the government sought to introduce a copy of that photograph and caption into evidence at Sally Smith's trial for bank robbery, the account's authenticity would be at issue because the Facebook post would only be a relevant admission if the account were actually Sally's. Cf. United States v. Vayner, 769 F.3d 125, 131 (2d Cir. 2014) (finding inadmissible a printout from a Facebook page under the name of the defendant, where the government presented the printout as evidence of the defendant's statements but "did not provide a sufficient basis on which to conclude that the proffered printout was what the government claimed it to be -- [the defendant's] profile page").

Indeed, if a proponent of social media evidence seeks to introduce the evidence to show that "the [social media] page or a post is that of a particular person, authenticity standards are not automatically satisfied by the fact that the post or the page is

- 14 -

"it is not at all clear . . . why our rules of evidence would treat electronic photos that police stumble across on Facebook one way and physical photos that police stumble across lying on a sidewalk a different way." United States v. Farrad, 895 F.3d 859, 879-80 (6th Cir. 2018). Accordingly, the ordinary rules of authentication apply, and the question we must ask in assessing the district court's ruling is whether there was sufficient evidence for a reasonable factfinder to conclude that the photographs were what the government represented they were -- photographs of Vázquez-Soto.

## 2. The Identification of Vázquez-Soto

"A photograph's contents, buttressed by indirect or circumstantial evidence, can form a sufficient basis for authentication even without the testimony of the photographer or some other person who was present at the time it was taken." Holmquist, 36 F.3d at 169; see also id. ("A witness qualifying a photograph need not be the photographer or see the picture taken; it is sufficient if he recognizes and identifies the object depicted and testifies that the photograph fairly and correctly represents it." (quoting United States v. Clayton, 643 F.2d 1071, 1074 (5th

---

in that person's name . . . because someone can create a . . . social media page in someone else's name." Hon. Paul W. Grimm et al., Authenticating Digital Evidence, 69 Baylor L. Rev. 1, 31–32 (2017).

Cir. 1981)). The government offered the testimony of agent Morales that he downloaded the photographs because he recognized Vázquez-Soto. Morales identified Vázquez-Soto in the courtroom. He then pointed out Vázquez-Soto in each photograph and described his behavior (e.g., "I see [Vázquez-Soto] . . . . He's wearing the jacket and a helmet . . . . [T]he back of the helmet is a motorcycle logo, reddish. It's the same tag number as [that] of the motorcycle you're going to see."). In determining whether the photographs were authentic, the jurors could examine the photographs and rely on their own observations of Vázquez-Soto in the courtroom. Under these circumstances, a reasonable factfinder could conclude that the photographs depicted Vázquez-Soto. See Holmquist, 36 F.3d at 168-69.

## B. Relevance

Vázquez-Soto makes two relevance arguments. First, he contends that the photographs are irrelevant because he was charged with making false statements in 2013, "not . . . in either 2008 or 2010." (As noted, most of the photographs were undated, while one had a 2008 date stamp, and all were uploaded to Facebook in 2010.) Vázquez-Soto misses the point of this evidence. Although he was charged only with 2013 crimes, his injury occurred well before 2008, and by then he had been claiming disability benefits for years. Vázquez-Soto's engagement in strenuous physical activity during a time when he claimed to be totally disabled made it more

likely that he knew that the statements he made on his 2013 disability paperwork and in the rehab interview were false.[6]

Second, and more broadly, Vázquez-Soto argues that the government failed to prove that the photographs were taken during the period when he was accepting disability benefits, as required to establish their relevance. When the relevancy of evidence "depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). The necessary "conditional fact" -- here, that the photographs were taken during the relevant time period -- needed to be proven only by a preponderance of the evidence. United States v. Balthazard, 360 F.3d 309, 313 (1st Cir. 2004). To meet that standard, the government was not required to produce conclusive evidence that the photographs were taken after Vázquez-Soto claimed to be disabled. Rather, the question is whether the evidence permitted such an inference. See Domínguez-Figueroa, 866 F.3d at 485.

The government's showing met the required threshold. The photographs were uploaded in 2010, and one bore a 2008 date stamp. Although Vázquez-Soto questions whether those dates accurately

_____

[6] Evidence is relevant under the Federal Rules of Evidence if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added).

depict when the photographs were taken, it was up to the jury to evaluate the evidence of timing.[7]  See id. at 486 (noting that "[t]he fact that the government could not provide an exact date for [] photos [introduced into evidence]" did not affect admissibility but "was for the jury to weigh").  The photographs that were not date-stamped included similar features to the stamped photograph (e.g., the same individuals in the same clothing).  In addition, the jury could judge for itself from the photographs and Vázquez-Soto's appearance in the courtroom approximately how much time had passed between when the photographs were taken and the time of the trial.  Under these circumstances, a reasonable factfinder could conclude that it was more likely than not that the photographs were taken during the relevant time period.

## C. Prejudice

Under Rule 403 of the Federal Rules of Evidence, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403 (emphasis added).  Here, although the photographs were prejudicial "in the sense that they were damaging [to the defendant]," Pérez-González, 445 F.3d at 47, Rule 403 concerns only unfair prejudice -- that is, "an undue tendency to suggest decision

---

[7] Vázquez-Soto did not object to the date stamp on hearsay grounds at trial and does not raise the issue on appeal.  We therefore do not address the viability of such an argument.

- 18 -

on an improper basis, commonly, though not necessarily, an emotional one," Old Chief v. United States, 519 U.S. 172, 180 (1997) (quoting Advisory Committee's Notes on Federal Rule of Evidence 403, 28 U.S.C. App., p. 860). The photographs are not the sort of "shocking or heinous" evidence that was "likely to inflame the jury" to decide the case on an improper basis, such as an emotional ground. United States v. Moccia, 681 F.2d 61, 64 (1st Cir. 1982). Moreover, the jury saw surveillance video evidence of Vázquez-Soto engaged in similar conduct as that in the photographs, e.g., riding his motorcycle with a heavy helmet. In terms of subject matter, the photographs were just more of the same.

## IV.

Vázquez-Soto argues that the district court erred when it denied the jury's request for a transcript of the testimony of Dr. Sein and declined to inform the jury that it could request a readback of the testimony. Our review is for abuse of discretion. See United States v. Rodríguez, 457 F.3d 109, 119-120 (1st Cir. 2006) (concerning request for transcript); United States v. Boulerice, 325 F.3d 75, 85 (1st Cir. 2003) (concerning request for readback).

### A. Background

The jury requested the transcript of Dr. Sein's testimony at the end of the first day of its deliberations in a note submitted to the court. The court consulted with counsel (outside the jury's

presence) and indicated its inclination to deny the request, explaining that "there [was] no official transcript yet" and it would take time "to formally prepare" -- possibly "a day or two or three."  It proposed telling the jurors to rely on their memory of the testimony, which had been given just the day before.  The court noted that "[t]his is not a seven-month trial or a very lengthy testimony," and it indicated concern about an unnecessary delay in the proceedings.  The government agreed that the jurors should be told to rely on their notes and memory, and defense counsel urged the court to provide a transcript because of the technical nature of Dr. Sein's testimony.

The court and parties then discussed whether the jurors had in fact been seeking a readback of the testimony rather than a physical transcript, as well as whether they wanted to review all of Dr. Sein's testimony or only a portion of it.  The court observed that providing either a transcript or readback would extend the trial into the next week because of his schedule and because, "even before a readback[,] the parties have to have an opportunity to review [the] transcript," which would probably take at least twenty-four hours.[8]  Ultimately, the court decided to "inform the

---

[8] Neither party disagreed with the court's statement that even a readback would require a delay of at least a day.  The court reporter described the necessary preparation as follows:

> What happens is that I provide, as [defense counsel] is saying, a rough draft of the transcript with the entire testimony minus the

- 20 -

[jurors] that they're not entitled to see the transcript itself, that they do have the report [of Dr. Sein], that they have their notes . . . . And if they say [that] [i]f we cannot [have] the transcript then we would ask for a readback or something, then I will review that."

The court thus instructed the jurors as follows:

Let me inform you that [the] transcript [of Dr. Sein's testimony] is not available at this time, and transcripts are not provided to the jury and what you want to see is the transcript. What you do have is the report of Dr. [Sein] which you can review. And you also have your jury notes of his testimony, as well as your memory of what he testified. So, there is no transcript. I cannot provide a transcript at this time, so that's what I have to say about that matter.

So, continue your deliberations. What I would ask is that before you leave now, . . . if there's anything else you wish me to clarify or request, go back to the jury room and within the next five minutes send me another note. I will excuse you after that. And if you don't have anything else to add, just send me a note just telling me, Judge, we're done for the day, we'll be back tomorrow. And if you do have a note, I'll

objections and colloquy. You'd review it, and once you all approve it that is what I read to them.

Although the parties did not suggest a different process to the district court, a readback of testimony may not require preparation of a transcript in every instance. It may be possible, for example, for a court reporter to "accurately read[] back from her stenographic notes." Boulerice, 325 F.3d at 85; see also id. at 84 (describing defense counsel's account that such a procedure is used in some courts).

respond very, very quickly so you can all leave.

The jury subsequently sent a note stating that it was ready to recess until the following morning.

Late the next afternoon, while the jury continued to deliberate, the court and counsel reconvened to discuss whether, and when, the court should give "the modified Allen charge" -- i.e., an instruction addressing the possibility that the jury was deadlocked.  See Allen v. United States, 164 U.S. 492, 501 (1896); United States v. Vanvliet, 542 F.3d 259, 263 (1st Cir. 2008).  After discussing the logistics if the deliberations continued into the next day -- when the trial judge would be unavailable[9] -- all agreed that the Allen charge should wait until the end of the day, when the jurors were expected to either reach a decision or report that they had been unable to agree.

Defense counsel then returned to the issue of a readback, noting that "[t]he only issue I think might be loose is whether there should be a readback . . . based on their questions."  A colloquy followed in which the court stated that "[t]hey have to request a readback because I told them jurors don't take transcripts to the jury room."  After defense counsel observed that "nobody has

_____

[9] The presiding trial judge had arranged for a colleague to take the jury's verdict and deal with routine jury issues, if necessary, but he explained that, "if it's something that is crucial that I make the determination, it will have to wait or I will have to address that with [my colleague]."

- 22 -

told them that they have a right or the ability to request a readback," the court responded: "I don't give them that instruction, but if they want they're free to ask whatever, the sky's the limit, and they're aware of it.  They've asked -- and this jury has been pretty active."

Defense counsel then "formally" requested that the jury be notified of its right to request a readback.  The court refused, stating it had "already ruled on that."  It continued:

> If at some point they ask for anything
> pertaining to the transcript or any
> clarification or anything then I will alert
> them that if what they're asking is a readback
> they have to tell me exactly that, that they
> want a readback.  But from my explanation I
> say, if you need anything else, just let me
> know.  . . .  [T]hey haven't inquired as to
> that.  That was early on and they've
> continue[d] to deliberate for over a day.  So,
> let's see what happens[.]

At 9:48 PM, the jurors alerted the court that they had been unable to reach a verdict.  The court and counsel again conferred; they considered whether the court should give the modified <u>Allen</u> charge or whether the jury should be considered hung.  Defense counsel asked that the jurors be given the <u>Allen</u> charge the next morning and that the court also provide a readback of Dr. Sein's testimony.  He noted that the jurors "are looking for something they have not found, and that request was never complied with."  Defense counsel "urg[ed] the Court to consider the readback

- 23 -

because if they don't know to ask for it, how would they know to ask for it."

The court decided to read the modified <u>Allen</u> charge immediately and to let the jurors choose whether to continue deliberating, recess for the night, or advise the court that they cannot reach a verdict. It gave that instruction, noting "one last thing": "When you send me a note if you need me to clarify anything else or have any further request please do not hesitate to ask me[.]" The jurors chose to resume deliberations the following morning, and they reached a verdict two days later.

## B. Discussion

We begin with Vázquez-Soto's contention that the district court erred by declining to instruct the jury that it could request a readback. We rejected a similar claim in <u>United States</u> v. <u>Aubin</u>, 961 F.2d 980 (1st Cir. 1992), where we noted that the jury "does not have the right to a rereading," <u>id.</u> at 983, and that "rereading testimony during jury deliberations rests in the presider's sound discretion," <u>id.</u> (omitting alteration) (quoting <u>United States</u> v. <u>Akitoye</u>, 923 F.2d 221, 226 (1st Cir. 1991)). Even if the jury had "asked for a portion of the testimony to be read back," we observed, "the judge would have been within his discretion to refuse the request." <u>Id.</u> at 984. Accordingly, we held that "the judge's

- 24 -

refusal to advise the jury that it could have the testimony reread was not error."  Id.

We likewise find no abuse of discretion in the district court's decision here not to explicitly offer the jurors a readback. The court advised the jurors that they should "not hesitate to ask" if they needed him "to clarify anything else or have any further request," and, in explaining to counsel why he would not make an explicit readback offer, the court noted that the jury had been "pretty active" and that they were aware that "they're free to ask whatever."  In other words, the court left open a door for further requests that it evidently deemed wide enough for this jury.  Cf. Akitoye, 923 F.2d at 227 (noting as "most important" in upholding a judge's refusal to read back testimony that the "refusal was not unconditional, but left the door open to renewal of the request").[10]

Moreover, it is apparent that the court viewed a readback, on balance, as unnecessary and impractical in the circumstances before it.  As described above, the court noted that neither the trial nor Dr. Sein's testimony was lengthy, that the

_____

[10] There is considerable logic in defense counsel's position that the jurors would be unlikely to request a readback if they were not told they could do so.  Nonetheless, our caselaw leaves to the discretion of the trial judge how to handle requests for transcripts and whether to offer the alternative of a readback. However, "in some jurisdictions a readback may be required by statute or as an inherent right of the jury."  Thomas Lundy, Jury Instruction Corner: Responding to the Jury's 'Inconvenient Request' to Rehear Testimony, 32-MAR Champion 58, 58 (2008) (footnote omitted) (citing cases).

testimony was given on the day before deliberations began, and that the jurors had available both their notes and Dr. Sein's written report.[11]  Among the factors we have considered significant in upholding a trial judge's refusal to reread testimony is the court's ongoing consultation with counsel and "that the trial had been brief so that the testimony [requested] was fresh in the minds of the jurors."  Aubin, 961 F.2d at 983.  We also have recognized that the time involved in reading back testimony is "highly relevant." United States v. Argentine, 814 F.2d 783, 787 n.4 (1st Cir. 1987); see also Akitoye, 923 F.2d at 226 (stating that "[t]he factors the judge should consider in responding to a jury's expressed desire to rehear testimony include whether the request is 'reasonably well-focused,' whether there is any 'physical or logistical impairment to reading' the testimony back, and the amount of time the procedure would probably consume" (quoting Argentine, 814 F.2d at 787)).

The rationales we have previously identified as appropriate make manifest not only that the court would not have abused its discretion if it denied a jury request for a readback, but also that the court did not err in rejecting the requests from

_____

[11] Dr. Sein's thirteen-page report propounded the same conclusion he gave at trial: that Vázquez-Soto's neck and lower-back injuries made him unable to return to work.  The report also detailed the medical history and physical exams on which Dr. Sein relied.  Vázquez-Soto does not contend that Dr. Sein's testimony added any new information.

counsel for a readback or physical transcript.  The court consulted with counsel and weighed their arguments, and it made a supportable judgment call based on both the logistics -- i.e., the delay that would result -- and the jury's ability to evaluate Dr. Sein's testimony without rereading it or hearing it reread.[12]

Whether the court might have made a different determination if the jury had expressly requested a readback is not the question before us.  The court properly exercised its authority not to offer that option, and we find no abuse of discretion in its decision to instruct the jurors to rely on their memory, notes, and Dr. Sein's report in lieu of a transcript or readback.

**V.**

Sufficient evidence supported the convictions of Vázquez-Soto for making false statements and theft of government property.  The district court did not abuse its discretion in admitting the Facebook photographs.  Nor did the court abuse its discretion by declining to provide a transcript or readback of Dr. Sein's testimony or to inform the jury that it could request a readback of the testimony.  We therefore affirm.

So ordered.

---

[12] We note that different factors can come into play depending on whether the jury requests a transcript or readback; for example, a readback may be available without the delay required to prepare a transcript.  See supra note 8.  On appeal, Vázquez-Soto does not present separate arguments on the two options, and we likewise treat the court's articulated rationales as applicable to both.

- 27 -