**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0387n.06

No. 16-1592

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jun 30, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| JABRON THOMAS, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before: BOGGS, MCKEAGUE, and GRIFFIN, Circuit Judges.

**BOGGS, Circuit Judge.** A jury convicted Jabron Thomas of armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d); brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 924(g). The district court sentenced Thomas to 96 months of imprisonment on the armed-robbery and felon-in-possession counts, to run concurrently, followed by a consecutive 84 months of imprisonment for the § 924(c) firearm count, for a total of 180 months of imprisonment. On appeal, Thomas argues—and the government agrees—that there was insufficient evidence to support the felon-in-possession charge because that charge concerned a weapon found at Thomas's workplace four days after the robbery, in a location shared by individuals other than Thomas.

Thomas raises three additional grounds on appeal: (1) the district court abused its discretion when it allowed the prosecution to introduce Facebook and Instagram pictures of

Thomas to identify him as the robber, without laying a proper foundation; (2) the district court abused its discretion in allowing the prosecution to elicit testimony from Thomas's parole officer that implied that Thomas was on parole, when Thomas had agreed to allow his parole officer to testify only for the limited purpose of identifying Thomas; and (3) the district court erred in denying Thomas's motion for new trial based on improper external influence on the jury, which Thomas alleged occurred when some jurors took a piece of evidence—Thomas's shoe—to the bathroom to hold it up to the light in order to compare it to video footage of the robbery that showed the robber allegedly wearing the same shoe.

We reverse Thomas's conviction and sentence for being a felon in possession of a firearm, and, because that conviction increased Thomas's Sentencing Guidelines offense level by two, we remand for resentencing. We affirm the judgment below in all other respects.

**I**

On July 14, 2015, Thomas walked into the Huntington Bank in Redford, Michigan, approached the window of a teller, and placed a black and silver handgun on the counter. Thomas stared at the teller and nodded, prompting the teller to shove money from her drawer through the window. Thomas then said, "her too," referring to a neighboring teller. Thomas moved to the neighboring teller's window and pointed the gun at her; she gave him the money from her drawer as well. Thomas then left the bank, stopping only to attempt—unsuccessfully—to persuade a female customer to come with him; the customer resisted, so Thomas left alone, and, for a few days, he evaded detection and capture.

The Redford police, meanwhile, arrived to investigate the robbery. Witnesses—including customers and bank staff—described the robber's height, weight, race, and clothing, noting such details as the robber's thin goatee and dark Detroit Tigers hat, and that the robber

had left in a dark blue or grey four-door sedan such as a Buick or an Oldsmobile. Surveillance video footage also depicted the robbery. Local news outlets aired coverage on the robbery, and, four days after the robbery, a viewer called in to identify the robber as the viewer's Facebook friend, Jabron Thomas. Redford police officers searched Facebook for that name and found a publicly available profile with several photographs of an individual who appeared to match the description of the robber. The Facebook profile listed Thomas's place of employment as Rite-Touch Auto Sales, located about two miles from the bank. Acting on this information, all six Redford police officers who were then on duty drove to Rite-Touch Auto Sales.

When they arrived, the officers saw Thomas standing in the entry, talking to a customer. Thomas saw the police officers and then walked inside, making his way to the office before closing the door. After a few minutes, Thomas emerged from the office and was arrested.

Police subsequently entered the office and recovered a handgun in a gun case in a desk drawer. The officers also located a blue Buick sedan parked by the garage; the title to the car was inside, and it had been registered to Thomas the day after the robbery. The next day, police searched Thomas's house (having received consent to search from a woman who lived there) and found a pair of black cargo shorts with a tassel hanging from the leg that matched the shorts worn by the robber as seen in the surveillance video.

A six-day jury trial ensued in the United States District Court for the Eastern District of Michigan. The trial focused on whether Thomas was in fact the person depicted in the surveillance video; whether the robber's gun was real or fake; and whether Thomas was in possession of the gun found at Rite-Touch Auto Sales. Both bank tellers testified and made in-court identifications of Thomas. Thomas was convicted on all counts and timely appealed.

**II**

For the reasons that follow, we vacate Thomas's conviction for being a felon in possession of a firearm and we remand for resentencing, but we affirm the district court in all other respects.

### A. There Was Insufficient Evidence to Support a Conviction for Being a Felon in Possession of a Firearm

Thomas argues that there was insufficient evidence presented below to support a conviction for being a felon in possession of a firearm. The jury convicted Thomas based on the fact that police found a silver handgun in the Rite-Touch Auto Sales office that looked similar to the gun used in the robbery and based on Thomas's suspicious behavior of entering the office for a few minutes, and then exiting, when the police arrived. Thomas moved for judgment of acquittal on the felon-in-possession charge, and the district court denied that motion.

The district court correctly set forth the applicable law as follows:

> A defendant may be convicted under § 922(g)(1) based on actual or constructive possession of a firearm. *United States v. Grubbs*, 506 F.3d 434, 439 (6th Cir. 2007). While actual possession requires that the defendant have "immediate possession or control" of the firearm, constructive possession only requires that the defendant "knowingly has the power and the intention at a given time to exercise dominion and control over an object[], either directly or through others." *Id*. (internal citations and quotations omitted). In proving constructive possession, it is well established that an individual's presence near a firearm, on its own, is not a sufficient showing of the "requisite knowledge, power, or intention to exercise control over" . . . the firearm. *United States v. Birmley*, 529 F.2d 103, 107–08 (6th Cir. 1976). And, while mere presence is insufficient to establish constructive possession, "other incriminating evidence, coupled with presence, . . . [will serve to] tip the scale in favor of sufficiency." *Id*. at 108. Both actual and constructive possession may be established by direct or circumstantial evidence. *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973).

R.86 at 4.

The district court declined to decide whether Thomas was in actual possession of the gun and instead went on to analyze whether Thomas was in constructive possession of the gun:

Here, the record before the jury demonstrated that Defendant was arrested at his place of employment (Rite Touch Auto) a few days after he was allegedly seen on camera robbing a bank with a firearm that was never recovered. Upon arriving to Rite Touch Auto, Officer Bommarito testified that he had observed Defendant walking through the front door and then quickly turning back into the building when he saw that officers were approaching. (D.E. No. 75, Trial Transcript at 34–35). At this point, Latico Marshall (an employee at Rite Touch Auto) testified that she observed Defendant quickly walk into an interior office and close the door behind him. (D.E. No. 81, Trial Transcript at 99, 103–04). Several minutes later, officers entered the reception area and asked whether Defendant had entered the office. Defendant made his way out from the office before anyone had the opportunity to call for him. After Defendant's arrest, a firearm was retrieved from an unlocked drawer in the office where he had fled.

*A reasonable jury could infer from these facts* that Defendant had constructive possession of the retrieved firearm.

R.86 at 6–7 (emphasis added).

Thomas argues—and the government agrees—that, indeed, no reasonable trier of fact could have inferred Thomas's constructive possession of the gun "beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), based on the facts cited by the district court. We also agree: Thomas's behavior of entering the office was suspicious, to be sure, but on its own amounts only to presence near a firearm, which we have held insufficient to prove possession. *See Birmley*, 529 F.2d at 107–08. Moreover, the record reveals that the gun that was found was in an office that belonged to the owner of Rite-Touch and in which all the Rite-Touch employees ate lunch, took breaks, and kept files, and none of the trial testimony weighed in favor of a finding that Thomas, rather than someone else, had dominion and control over the gun.

Because the only evidence connecting Thomas to the gun found at Rite-Touch was Thomas's presence in the office for a few minutes after the police arrived and before Thomas was arrested, the district court erred in denying Thomas's motion for acquittal as to the felon-in-possession charge, and we reverse and remand as to that conviction only.

### B. The District Court Did Not Abuse Its Discretion in Allowing the Government to Use Pictures from Thomas's Facebook and Instagram Profiles to Identify Thomas as the Robber

We review the district court's evidentiary rulings, including rulings on whether a given piece of evidence was properly authenticated, for abuse of discretion. *See United States v. Morales*, 687 F.3d 697, 701–02 (6th Cir. 2012); *United States v. DeJohn*, 368 F.3d 533, 543 (6th Cir. 2004). Thomas challenges the authentication of the Facebook and Instagram photographs used to identify him at trial.

To authenticate a photograph, "the proponent must produce evidence sufficient to support a finding that the [photograph] is what the proponent claims it is," Fed. R. Evid. 901(a); *see United States v. Hobbs*, 403 F.2d 977, 978 (6th Cir. 1968) (noting that, unlike in the early days of using photographs as evidence, "the proponent of a proffered photograph has established a prima facie case for its admissibility when he has shown it to be an accurate representation of the scene in question"). Evidence in support of authentication may include witness testimony that a photograph "is what it is claimed to be." Fed. R. Evid. 901(b)(1). Authentication does not require *certain* proof, but rather only enough proof "so that a reasonable juror could find in favor of authenticity." *United States v. Jones*, 107 F.3d 1147, 1150 n.1 (6th Cir. 1997) (quoting 5 Jack B. Weinstein et al., Weinstein's Evidence, at 901-19 (1996)).

At Thomas's trial, Redford Police Lieutenant David Holt—the officer who initially located Thomas's public Facebook profile—testified that he logged onto Facebook with his own account and typed the name "Jabron Thomas" into Facebook "to check and see if there was any public profile associated with that name." R.80 at 124. Holt found such a profile and found that the profile "had photographs associated with" it, along with a place of employment listed as "Rite-Touch Auto." Holt downloaded five images from the profile, saved them, and identified them in court as the photographs that he had found on the public Facebook profile; the

government then offered these five photographs into evidence as "photos that [Holt] saved from the Facebook page that [Holt] pulled after typing in the name 'Jabron Thomas' on Facebook." *Id.* at 126. Thomas argues that these photographs could not be authenticated and were thus inadmissible in part because Holt admitted that he did not know who created the Facebook page or whether the Facebook page itself was authentic. Appellant's Br. 27.

The government also called FBI Special Agent George Rienerth, who testified that he identified a publicly accessible Instagram page listed as belonging to a user with a username "jabront80" and a full name "Jabron L. Thomas," with "85 posts, 321 followers, 1,824 following." R.82 at 121. Rienerth testified that he downloaded three photographs from the Instagram page, which the government offered into evidence as the photographs that Rienerth downloaded from that page. Thomas argues that these photographs could not be authenticated and were thus inadmissible in part because Rienerth admitted that he did not know who created the Instagram page, who uploaded the photographs, or whether the Instagram page was authentic.

Our court has not yet confronted the question whether social-media-profile photographs are admissible to identify the person who is purported to be the owner of the profile. In many contexts, the question could conceivably be quite interesting: what if, for example, the owner of a social-media profile (let's call him Alex) used a picture of someone else (say, Bob) as his profile picture? If Bob robbed a bank, Alex would not want to be implicated as the robber simply because he had Bob's picture on his social-media profile. Or, what if Bob fabricated a social-media profile under Alex's name, but with Bob's picture—and then Bob robbed a bank? Or, less convolutedly, what if there were allegations that the online photographs had been digitally manipulated or hacked in some way?

None of these questions—or any like them—is presently before us, however, so we see no reason to depart from the ordinary rule that photographs, including social-media photographs, are authenticated by "evidence sufficient to support a finding that the [photograph] is what the proponent claims it is," Fed. R. Evid. 901(a).  Here, the pictures appeared to show Thomas with distinctive tattoos on his hands and his arms; appeared to show Thomas wearing a Rite-Touch Auto hat; and appeared to show Thomas wearing Detroit Tigers or other Detroit-related hats (although not the *same* Detroit Tigers hat as the one worn by the robber).  One of the pictures appeared to show Thomas at a Tigers game with "Go Tigers!!!" written on the photograph.  And more importantly, at the end of the day, the government was seeking to admit the photographs only as the photographs of a Facebook user and an Instagram user who had profiles carrying the name "Jabron Thomas."  The government was not seeking to authenticate a Facebook page or an Instagram page; the government was not seeking to authenticate *Jabron Thomas's* Facebook page or Instagram page (nor any of the factual information contained therein, such as Thomas's workplace); and the government was not even necessarily presenting the photographs as "pictures of Jabron Thomas"—the jury was free to consider the photographs as identifying Thomas or not.

A district court does not abuse its discretion when it admits social-media photographs that are offered into evidence after testimony that the photographs are what the proponent claims them to be.  Here, that meant admitting the photographs after hearing testimony that the photographs to be admitted were indeed the photographs downloaded by the law-enforcement officers who found them. And the district court here—after considering the testimony of officers Holt and Rienerth, and being able to look at Thomas and the photographs—did not abuse its discretion in admitting the photographs that Thomas challenges.

8

### C. The District Court Did Not Abuse Its Discretion in Allowing the Government to Use the Testimony of Thomas's Parole Officer to Identify Thomas as the Robber

Before trial, the parties agreed that the government could call Sarah Wald, Thomas's parole officer, to identify Thomas as the robber in the bank-surveillance footage, so long as Wald's status as Thomas's parole officer was not put before the jury. At trial, Wald identified herself by her name only and stated that she worked in law enforcement and knew Thomas from nine face-to-face meetings that she had had with him. When the government asked how long those meetings were, Thomas objected to that line of questioning on the grounds that it could suggest, improperly, that Wald was supervising Thomas. The prosecutor agreed to move on, Thomas did not seek a cautionary instruction, and at no point did Thomas object to Wald's *identification* of him.

Thomas now claims that the district court erred in allowing Wald to identify him. *See* Appellant's Br. 28 ("Mr. Thomas was denied a fair trial when the government used his parole officer *to identify him* as the individual in the bank surveillance video."). This is said to be in violation of *United States v. Calhoun*, 544 F.2d 291, 297 (6th Cir. 1976) (reversing defendant's conviction for bank robbery where the defendant's parole officer identified the defendant from photographs of the robbery, because the probative value of the identification was substantially outweighed by the danger of unfair prejudice to the extent that the defendant's parolee status would make jurors aware that the defendant had recently been released from prison for committing other crimes). Because Thomas did not raise a Rule 403 objection to Wald's identification of him at trial, the district court's decision to allow Wald to identify Thomas is reviewed for plain error. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).

The district court did not plainly err. After all, unlike in *Calhoun*, Thomas *expressly agreed* to allow the government to call Wald to identify Thomas, and the government did not

break its promise not to disclose Wald's status as Thomas's parole officer. Thomas maintains that he preserved an objection to the prosecutor's line of questioning insofar as it could elicit answers from which the jury might infer that he was subject to parole supervision. This objection appears to have been withdrawn during a sidebar conference when the prosecutor agreed to move on. Yet, even if the objection were deemed properly preserved, we would find no abuse of discretion. While Thomas asserts that "[a]n inference" of Thomas's parolee status "in and of itself is prejudicial," nothing in Wald's testimony is sufficient to give rise to an inference that Thomas was on parole; at most, a juror may have speculated that Wald's "meetings" with Thomas were parole-supervision meetings, but speculation falls far short of logical inference.

### D. The District Court Did Not Err in Denying Thomas's Motion for New Trial

In addition to authenticating Thomas's Instagram photographs, Special Agent Rienerth testified that he recovered the Nike shoes that Thomas was wearing on the day of his arrest. Rienerth identified those recovered shoes at trial and testified that the shoes had a black Nike "swoosh" with a light gray outline. At closing argument, Thomas's defense counsel invited the jury to examine the shoes and compare them against the surveillance video's depiction of Thomas during the robbery: "When you look at [the surveillance footage] I want you to look at the Nike swish [sic]. You will see that it is filled with a white coloring and not a black coloring." Thomas's theory was that the shoes recovered from Thomas did not match the shoes worn by the robber in the surveillance video.

Acting on this invitation, some of the jurors took Thomas's shoes into the (evidently better-lit) bathroom to see whether, when held up to the light, the Nike swoosh more closely resembled the swoosh in the surveillance video—and they found that it did. Thomas argues that

this "experiment" was an improper science experiment that constitutes an external influence on the jury in violation of the Sixth Amendment Confrontation Clause. *See Doan v. Brigano*, 237 F.3d 722, 732–36 (6th Cir. 2001). In *Doan*, a juror wanted to validate the defendant's testimony that a room was too dark for the defendant to see certain bruises on the decedent, so the juror went home, put lipstick on her arm, and tested whether she could see it under similar lighting; the juror then reported her findings to the other jurors. We held that the experiment was error, but harmless error.

Thomas argues that the district court should have granted him a new trial because, after the return of the jury verdict, two jurors disclosed to the court that they had conducted their experiment with the shoes. We review the denial of a motion for new trial for abuse of discretion. *United States v. Dado*, 759 F.3d 550, 559 (6th Cir. 2014).

The district court did not abuse its discretion in denying a new trial. Unlike in *Doan*, in which a juror used her own lipstick to conduct an experiment at home, all the jurors did here was to examine the visual appearance of the swoosh on Thomas's shoe to compare it with the shoe depicted in the video—as Thomas's counsel himself had invited them to do. While the Constitution protects defendants from extraneous influences upon juries, jurors have free rein to examine the evidence admitted, even if that means picking it up, putting it down again, or holding it up to the light. *See United States v. Avery*, 717 F.2d 1020, 1026 (6th Cir. 1983); *United States v. Abeyta*, 27 F.3d 470, 477 (10th Cir. 1994) ("There is simply no constitutional command preventing a jury from using common sense and ordinary and uninflammatory props to reenact a crime in the privacy of the jury room.").

**CONCLUSION**

In sum, we REVERSE Thomas's conviction and sentence for being a felon in possession of a firearm, and, because that conviction increased Thomas's Sentencing Guidelines offense level by two, we REMAND for resentencing. We AFFIRM the judgment below in all other respects.