IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2019 Session

## STATE OF TENNESSEE v. JAVON JOLARRY SPIVEY

**Appeal from the Criminal Court for Davidson County
No. 2017-C-1866    Cheryl A. Blackburn, Judge**

_____

## No. M2018-00263-CCA-R3-CD

_____


A Davidson County Criminal Court Jury convicted the Appellant, Javon Jolarry Spivey, of first degree premeditated murder, felony murder, attempted first degree murder, especially aggravated burglary, employment of a firearm during the commission of or attempt to commit a dangerous felony, and robbery.  After merging the first degree premeditated murder and felony murder convictions, the trial court imposed a total effective sentence of life plus thirty-seven years.  On appeal, the Appellant contends that the trial court erred by allowing the State to introduce a video and still photograph of him the police found on YouTube without proper authentication.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Mark C. Scruggs, Nashville, Tennessee, for the Appellant, Javon Jolarry Spivey.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan King and Byron Pugh, Assistant District Attorneys General, for the Appellee, State of Tennessee.


## OPINION

## I.  Factual Background

The Appellant's convictions stemmed from a break-in at a residence, during which one occupant was killed and another was seriously injured. Immediately following the break-in, a debit card stolen during the burglary was used at a local automatic teller machine (ATM), but the perpetrator was unable to withdraw money because the account had insufficient funds. Shortly thereafter, a man was assaulted and robbed by an individual identified as the Appellant at another ATM in the area.

At trial, Anne Peterson, a retired registered nurse, testified that on August 30, 2014, she was living with her son, Charles Carl Peterson, IV, in his house on Ascot Drive in Antioch. The house had four bedrooms and two bathrooms upstairs and a bonus room over the garage. Between 3:00 and 4:00 a.m., she was watching television in her room, and the lights and the television in her room suddenly "went black." She walked down the hall to her son's bedroom and woke him. He got up, turned on the lamp next to his bed, and went downstairs to check the circuit breaker. Immediately after he descended the stairs, she heard two gunshots in rapid succession. Ms. Peterson was terrified and walked to the doorway of her bedroom. Ten to fifteen seconds later, two men ran upstairs toward her. The taller man, whom she identified as the Appellant, said, "[D]on't expect no f[*****]g help from your husband because I done shot him dead."

Ms. Peterson said that the hall was well-lit and that she could see the perpetrators clearly. The Appellant was approximately 5'11" to 6' tall, and he was slim. He was wearing a short-sleeved white t-shirt, blue jeans, gray athletic shoes, and a camouflage baseball cap. Ms. Peterson said that the Appellant "had chin-length dreadlocks" that appeared to have been tinted and "had a little bit of Mr. Brown and a little bit of blonde in them." The Appellant had a small black handgun with a red laser light on top of it. The other man was shorter and stockier than the Appellant and had paler skin. She estimated that he was approximately 5'10" tall. Ms. Peterson did not recall what the second man was wearing.

Ms. Peterson said that when the Appellant reached the top of the stairs, he hit her on the head two or three times with the butt of the gun then "shot the end of [her] right great toe off," which caused her to bleed. Ms. Peterson was "[t]errified." The Appellant grabbed her arms and threw her hard against the walls. He demanded her driver's license, debit card, money, and drugs.

The Appellant gripped Ms. Peterson's arms and dragged her into her bedroom. He took money, her driver's license, Regions Bank debit card, and TJ Maxx credit card from her wallet. Ms. Peterson said that she had written her personal identification number (PIN) on the back of the debit card. The Appellant took expired prescription medication that was stored inside Ms. Peterson's bedside table. He then searched all of the drawers in her bedroom.

Ms. Peterson said that when the Appellant finished searching her bedroom, he dragged her to her son's bedroom where the other man was. The other man had put the television face-down on her son's bed. Two pieces of computer equipment had been taken from her son's study and placed on her son's bedroom floor. Both men searched all of the drawers in her son's bedroom.

Ms. Peterson said that she had a "simple flip phone" and that she kept a flashlight in her bedside table. During the fifteen minutes the men were in the house, one or both of them used the flashlight. As the incident transpired, she heard the men "mumble[] some things" to each other, but she could not understand what they said. She did not see the other man with a gun.

Ms. Peterson feared the Appellant would kill her because he had told her "he was going to blow [her] f[*****]g brains out." When she had the chance to escape, she ran down the stairs, out the front door, and directly across the street to Mary Ann and Charlie Loffmin's house. She hid behind some shrubs then went onto the porch and rang the doorbell. She saw the Appellant approaching her, and she ran toward the Loffmins' back fence and yelled for Mrs. Loffmin because she knew their bedroom was located at the back of the house. The Appellant caught Ms. Peterson, knocked her down, and shot her once in the right arm and three times in the back of her head. The Appellant stomped her between her shoulder blades, called her a "f[*****]g white honkey b[***]h," and walked off, "basically [leaving her] for dead."

Ms. Peterson "played dead" until the Appellant walked across the street to her house. Ms. Peterson alternately crawled and walked until she reached the Loffmins' front door. She rang the doorbell and yelled. Mr. Loffmin told her to go to the window because he was afraid someone was behind her. After confirming that she was alone, the Loffmins let her inside their home, and Mrs. Loffmin called 911. Ms. Peterson spoke with the 911 operator and gave the same description of the Appellant that she gave in court. Regarding her condition, Ms. Peterson said, "In the beginning it was, you know, I knew I was bleeding and I felt scared, you know, but okay, and towards the end my face, I started going numb in my head and down my side." She was in a lot of pain and was taken to Vanderbilt Hospital. Ms. Peterson estimated that from the time she saw the men to the time the Appellant left her in the Loffmins' yard, approximately fifteen to twenty minutes had elapsed.

Ms. Peterson said that a detective came to the hospital to interview her. She told the detective what had transpired and described the Appellant. The detective showed her a lineup, but she was unable to identify anyone.

Ms. Peterson said that after she left the hospital, she went to her brother's house in Fayetteville. Approximately one week later, Detective Wall came to the house and showed her a different lineup. Ms. Peterson identified the Appellant from the lineup and said that she was "100 percent" confident of her identification. She said, "I will never forget his face. . . . When someone is this close to you and is pointing a gun with a red light on it next to your head and is facing you right in your face and telling . . . you that they are going to kill you, you can't forget that." Ms. Peterson said that she did not know Terry Brown and had not discussed her identification of the Appellant with him.

Ms. Peterson said that her son's house had a door on the side of the garage. She normally locked the door but could not recall if the door was locked on the night of the offense.

Ms. Peterson said that she had scars from the gunshots to her head. She was hospitalized for two or three days. She did not need surgery but had to refrain from moving her mouth for approximately six weeks. She said that the Appellant had "completely shot away the anterior ligament on [her] big toe" and that after the shooting, her toe was occasionally swollen, numb, and uncomfortable. Ms. Peterson said that the Appellant had injured her right arm by gripping it too tightly. Additionally, when the Appellant stomped her back, he fractured her thoracic vertebrae, and her movements were restricted for three months due to the injury.

On cross-examination, Ms. Peterson said that she had a vivid memory of the incident. She did not recall telling a detective that the lights never came back on inside the house and asserted that the statement was not correct. She explained that if she made such a statement, it must have been shortly after she was seriously injured. She maintained that the Appellant was between 5'10" and 6' tall and did not recall telling the detective that he was between 6'2" and 6'4". Ms. Peterson was shown a transcript of the preliminary hearing but did not recall testifying that the Appellant could not have touched the television that was in her son's bedroom and that she did not know why she would have said such a thing.

On redirect examination, Ms. Peterson said that to the best of her recollection, she saw the Appellant touch the television. After listening to the relevant part of the recording of the preliminary hearing, she asserted that the transcript must have been incorrect because she meant to say the Appellant "could have" touched the television.

Mary Ann Loffmin testified that she and her husband Charles lived across the street from the Petersons. The Loffmins had a good relationship with the Petersons. Mrs. Loffmin knew Ms. Peterson had medical issues that kept her up at night. On the night of the offense, Mrs. Loffmin was awakened around 4:00 a.m. She said she heard her

"doorbell ringing, I mean, pop, pop, pop, pop, pop." Mrs. Loffmin thought children were playing a prank. She and Mr. Loffmin got out of bed, and Mrs. Loffmin grabbed the telephone. Mr. Loffmin grabbed his gun, and they went to investigate. Mrs. Loffmin looked out a front window and the peephole on the front door, and Mr. Loffmin "went upstairs and got a better look from the front top." Mrs. Loffmin noticed that lights were on inside the Petersons' house. Mrs. Loffmin started to call Ms. Peterson because she thought children were playing pranks; however, when Mrs. Loffmin heard two gunshots, she called 911 instead.

Afterward, Ms. Peterson banged on the Loffmins' door then came to their window. Ms. Peterson said that she had been shot and asked to come in the house. Mrs. Loffmin looked out the window and saw that Ms. Peterson was holding her jaw with one hand and holding her shoulder with the other hand. Ms. Peterson looked "bad"; she was bleeding and disheveled. Mrs. Loffmin opened the door, allowed Ms. Peterson inside the house, and placed another call to 911. Mrs. Loffmin had Ms. Peterson sit and put towels around her back and neck. Ms. Peterson continued to hold her face and shoulder. Mrs. Loffmin noticed that Ms. Peterson had an injury to her foot and that the injuries to her neck, back, and foot were bleeding.

Mrs. Loffmin said that Ms. Peterson was coherent but excited. Ms. Peterson told Mrs. Loffmin what just occurred at the Petersons' house, saying that the taller man had shot her in the foot and taken her from room to room to tell him the location of the valuables. Ms. Peterson also said that the taller man told her "he shot her f'ing husband, so don't go looking for him, he's dead, dead in the garage." Mrs. Loffmin took the man's statement to mean he had killed Mr. Peterson.

Mrs. Loffmin said that the police and an ambulance arrived at the scene and that the ambulance took Ms. Peterson to the hospital. A detective spoke with Mrs. Loffmin, and she told him what she knew.

On cross-examination, Mrs. Loffmin acknowledged that one of the houses in the neighborhood housed foster children. A house next to her had been burglarized, and Mrs. Loffmin had reported the burglary. The suspect was someone who lived at the foster house.

Terry Brown testified that between 5:00 and 5:30 a.m. on August 30, 2014, he drove down Nashboro Boulevard and turned onto Murfreesboro Pike. Mr. Brown saw a black male crossing Murfreesboro Pike and paused to let the man cross the street. The man looked toward the car and gestured to thank Mr. Brown, which gave Mr. Brown the opportunity to see the man's face clearly. Mr. Brown identified the man in court as the Appellant.

- 5 -

Mr. Brown drove to a Regions Bank that shared a parking lot with a Kroger grocery store and stopped at the drive-thru to access the ATM. As he placed his debit card into the ATM, he glimpsed someone kneeling behind his car and putting on a mask. A few seconds later, the man, whom he later identified as the Appellant, came to the driver's side window, grabbed Mr. Brown's arm, and took Mr. Brown's debit card out of the ATM. The Appellant put his hands on the top of the car on the driver's side. He was wearing jeans and a t-shirt that had "a red logo with a white circle around it." Mr. Brown said that the Appellant was the same person he encountered on the road and that he knew the identity "[b]y the t-shirt and by the emblem on it." Mr. Brown said that the Appellant was wearing a mask but that he could see the Appellant's eyes.

Mr. Brown said that the Appellant reached inside his car. Mr. Brown thought the Appellant was trying to take Mr. Brown's cellular telephone because Mr. Brown was calling 911. The Appellant scratched Mr. Brown's face. Mr. Brown said the Appellant "told me if I didn't give him my PIN number he was going to put a cap in my ass." Mr. Brown started blowing the car horn to attract attention, and the Appellant walked to the passenger side of the car and kicked the glass three times, trying to break it. The glass did not break, but the Appellant left his footprint on the glass. The Appellant then ran across the Kroger parking lot and down Nashboro Boulevard. As he ran, "some of his dreadlocks came out from under his mask." Mr. Brown estimated that the encounter lasted three or four minutes. After the Appellant left, a man, whose name Mr. Brown did not know, approached his car. Shortly thereafter, three or four police officers arrived.

Mr. Brown said that Detective Brandon Gant called him on September 3, 2014. Mr. Brown told the detective what had transpired at the ATM and described the Appellant. On September 15, 2014, Detective Gant showed Mr. Brown a photograph lineup, and Mr. Brown identified the Appellant. Mr. Brown was shown a photograph of the Appellant the Friday before trial, and Mr. Brown again confirmed the Appellant was the perpetrator. Mr. Brown noted that the scene had been "lit up like the Fourth of July," and he maintained that he did not "forget a face."

On cross-examination, Mr. Brown said that the Appellant's face could not be seen in the security video from the bank; however, he was able to see parts of the Appellant's face in person. Additionally, the person's shirt matched the shirt the Appellant was wearing when he crossed the street in front of Mr. Brown's car moments earlier.

Amenaghawon Michael Uwaifo testified that around 5:00 a.m. on August 30, 2014, he got off work and drove his pick-up truck to the Regions Bank on Murfreesboro Pike to withdraw money from the ATM. When he arrived, he saw a car in front of him. A man was standing between the ATM and the car, which he thought was strange.

- 6 -

Uwaifo looked more closely and saw that the man was wearing a mask and was "throwing elbows and fists through the car window of the driver's side." The man was a slender black male who was a "little tall." Uwaifo saw the man reach into the car window. He thought the driver must have rolled up the window, then Uwaifo saw the man's "fists kicking the car and the windshield like he is trying to break in." Uwaifo thought the driver was trying to defend himself. Realizing something was wrong, Uwaifo drove to the other side of the Kroger parking lot and parked facing the ATM. Uwaifo began honking his truck's horn and flashing its lights but was unable to distract the man. Uwaifo decided the man was unarmed and drove back toward the ATM. At that point, the man ran "up the hill, the road, there is a street next to Kroger and ran up. He didn't get in a car. He just ran off on foot."

Uwaifo called 911 then checked on Mr. Brown. He saw a little blood on Mr. Brown's face and noticed that Mr. Brown was "shaken up." Uwaifo spoke to the officers after they arrived at the scene.

Gregory Don Poss testified that he was a corporate security field investigator for Regions Bank. On August 30, 2014, he was contacted by a homicide detective who explained that a debit card had been stolen from a bank customer, Ms. Peterson. The detective asked Poss to examine Ms. Peterson's bank records to find out whether the card had been used and, if so, where it had been used. The bank records revealed that Ms. Peterson's stolen debit card was used multiple times on August 30 at a Pinnacle Point location on Murfreesboro Road. The location did not belong to Regions Bank, but it may have been a Bank of America location. The person attempted to withdraw money in amounts ranging from $20 to $300; however, sometimes the PIN was entered incorrectly or the account did not have sufficient funds to withdraw the requested amount.

Scott Perkins testified that he was the protective services manager for Bank of America and Merrill Lynch. He was contacted by a detective with the Metro Nashville Police Department (MNPD) who asked him to review the security video from the Bank of America ATM on Murfreesboro Pike for a transaction that occurred at 5:07 a.m. on August 30, 2014. The person in the video was wearing a mask that he pulled down before looking at the keypad of the ATM. Perkins noticed that the person was wearing a "distinctive watch." Perkins contacted the detective and provided him a copy of the security video and a photograph taken from the video.

Stanley Green, an investigator's assistant with Regions Bank, testified that the police asked him to find the security video showing the robbery of Mr. Brown. After locating the video, he provided it to detectives.

Joe Williams testified that on August 30, 2014, he was working as a crime scene investigator for the MNPD. At 7:44 a.m., he arrived at the Petersons' residence, and Officer Mark Rosenfeld briefed him. In the room where Mr. Peterson's body was found, the police found a 9 mm Luger live round and several bullet fragments. On the stairs, the police found bullet fragments and an expended casing. On the floor of Ms. Peterson's bedroom, the police found a silver flashlight and a cellular telephone. Inside the closet underneath the staircase, they found a bullet. Officer Williams said that the police found an expended casing in a backyard across the street.

Officer Williams said that the breaker box in the Petersons' garage appeared to have been "jarred open." Officer Williams explained that Mr. Peterson's body was found lying on the floor close to the door outside. Tools, screws, bolts, and other assorted items appeared to have been "dumped over." The police found another bullet, bullet fragments, and a live round. A rug in the garage appeared to have a strike mark from a bullet on it.

Mark Steven Rosenfeld testified that on the morning of August 30, 2014, he was a crime scene investigator for the MNPD, and he responded to the Petersons' residence. Upon his arrival, Officer Warren Fleak informed him that Mr. Peterson's body had been found in the garage, and Ms. Peterson had been located injured at a house across the street. Ms. Peterson told the officers what had occurred so the crime scene officers knew where to look for fingerprints. Officer Rosenfeld took fingerprints throughout the Petersons' house.

Sharon Tilley testified that on the morning of August 30, 2014, she was a crime scene investigator for the MNPD. She responded to the Petersons' residence and attempted to collect DNA from different areas around the house, such as the breaker box and door handles.

Detective Branden Gant testified that he was assigned to investigate a robbery at Regions Bank ATM on Murfreesboro Pike. Detective Gant interviewed Mr. Brown, who told him what had happened and described the perpetrator. Detective Gant developed the Appellant as a suspect and created a photograph lineup. On September 15, 2014, Detective Gant showed the lineup to Mr. Brown, who quickly identified the Appellant. Mr. Brown was confident in his identification. Afterward, Detective Gant obtained an arrest warrant for the Appellant. Detective Gant contacted Stanley Green with Regions Bank Security, who provided him with a copy of the security video from the night of Mr. Brown's robbery. On cross-examination, Detective Gant denied telling Mr. Brown that a suspect was in the lineup Mr. Brown was being shown.

Officer Brian Manning testified that around 6:00 a.m. on August 30, 2014, he went to the scene and collected fingerprints from Mr. Brown's vehicle. Officer Manning

explained that the bank where the robbery occurred was in front of a Kroger and essentially was in the Kroger parking lot.

Detective Corey Wall testified that he worked with Detective Chad High on the case of the robbery at the Bank of America ATM on Murfreesboro Pike. Detective High interviewed Ms. Peterson, and he told Detective Wall about the interview. Detective Wall discovered Ms. Peterson's bank account information, which he shared with Detective High. Detective Wall later reviewed an email conversation Detective High had with a representative of Bank of America. The conversation contained three photographs, two were black and white and one was color. The photographs were taken from the ATM security video and showed a black male wearing a "pinkish purple looking shirt[ with] some writing on the front and a large silver watch on one wrist." The man's face was not visible because he was wearing a ski mask. On August 30, 2014, the photographs were sent to the media.

Detective Wall said that the Bank of America ATM was across the street from the Regions Bank ATM. The Bank of America was near a shopping center, and the police obtained video surveillance footage from some of the surrounding businesses; however, the video did not aid the police in identifying the suspect.

Detective Wall said that on September 3, 2014, he received an email from Loretta Marsh, who was a supervisor in the fingerprinting division of the crime laboratory. Based upon the email, Detective Wall developed a suspect, compiled a photograph lineup, and showed the lineup to Ms. Peterson. Within about fifteen seconds, Ms. Peterson confidently identified the Appellant.

Detective Wall said that the Appellant was arrested in Gulf Port, Mississippi, and a member of MNPD's fugitive unit transported him back to Nashville. The police searched the Appellant's vehicle but found nothing of evidentiary value. Detective Wall said that the Petersons' residence and the Regions Bank ATM on Murfreesboro Pike were approximately 5.1 miles apart and that driving between the two locations would take ten to twelve minutes. Detective Wall said that the Appellant was a black male who weighed 150 pounds and was six feet tall.

On cross-examination, Detective Wall said that the Appellant was developed as a suspect because his fingerprint was found on Mr. Peterson's television. Later that day, Ms. Peterson was shown the photograph lineup.

Detective Joseph Chadwick High testified that on August 30, 2014, he went to the Petersons' residence, and he was briefed by other detectives. He spoke with the Loffmins, who told him what they had seen. Afterward, Detective High researched other

criminal activity that had occurred in the neighborhood and learned of an individual named Kendall Clark. Detective High asserted, however, that no evidence linked Mr. Clark to the instant crimes.

Detective High prepared a photograph lineup that included Mr. Clark, but Ms. Peterson did not identify a suspect from the lineup. Detective High then contacted a fraud investigator at Regions Bank and learned that Ms. Peterson's stolen debit card had been used at a Bank of America ATM around 5:00 a.m. on August 30, 2014. Detective High contacted someone at Bank of America and obtained several still photographs of the person who used Ms. Peterson's debit card.

Detective High said that as part of his investigation, he searched for "social media postings made either by or of" the Appellant. At the time of his search, Detective High knew what the Appellant looked like. Detective High recognized the Appellant in a video the police found on YouTube and said that a still photograph was taken from the video. The video and still photograph taken from the video were shown to the jury.

Detective High said that in the video, the Appellant was wearing a watch that was similar to the watch the person was wearing in the security video of the robbery at Bank of America. Detective High said that he did not know when the video was posted to YouTube, explaining that "from what I remember it was posted earlier that year, within the same, 2014, but I don't remember when."

On cross-examination, Detective High said that Ms. Peterson told him that she was prompted to get out of bed because the lights went off in the house and that the lights never came back on after the assault began. Detective High did not know if Mr. Clark's fingerprints were ever compared with any of the fingerprints found at the scene.

Detective High said that he originally found the YouTube video and that Jay Moyer, who worked for the "SI" division of MNPD, "actually offloaded or extracted it from the YouTube [s]ite." Detective High did not know who filmed or posted the video and did not know if the video had been altered prior to posting. Detective High acknowledged that he did not know "anything about the video other than it is something that [he] found on the internet."

Linda Wilson, a latent print examiner with the MNPD crime laboratory, testified that a fingerprint found on the television in Mr. Peterson's bedroom was the Appellant's fingerprint. Ms. Wilson also verified Jessica Davis's findings that a print taken from the driver's side door of Mr. Brown's car and a print from the window matched the Appellant's prints. None of the other prints collected had any value for comparison. On

cross-examination, Ms. Wilson acknowledged that she did not compare Mr. Clark's fingerprints with any of the fingerprints collected.

Lorita Marsh, a forensic supervisor with the MNPD crime laboratory's latent print unit, testified that she was the verifying examiner of the fingerprints submitted. Ms. Marsh agreed with Ms. Wilson's findings that the Appellant's fingerprint matched the fingerprint on the television in Mr. Peterson's bedroom.

Jessica Davis with the MNPD crime laboratory's latent print unit testified that she compared the known right palm print of the Appellant with prints recovered from the rear driver's side door and window of Mr. Brown's car and determined they matched.

Teri Arney testified that she performed firearms identification for the Tennessee Bureau of Investigation. She compared the bullets found in the Petersons' house and determined that they were both 9 mm bullets and that they were fired from the same firearm. The casings recovered also had been fired from the same firearm.

Rachel Mack with the DNA unit of the MNPD's crime laboratory testified that she was asked to test items for DNA, but she did not find any DNA in which the Appellant could be included.

Dr. Erin Carney testified as an expert in forensic pathology. She stated that she was an employee of the Center for Forensic Medicine, which served as the Davidson County Medical Examiner's Office and the Regional Forensic Center. Dr. Carney stated that Dr. Amy Haas performed the autopsy on Mr. Peterson's body but that Dr. Haas was no longer employed with her office. Dr. Carney said that she had reviewed the case file, including the autopsy report prepared by Dr. Haas, the photographs from the autopsy, and the photographs from the crime scene.

Dr. Carney said the report reflected that the external examination of the body revealed a bullet entered the left ear and severed the spinal cord. The wound was fatal. From stippling on the left side of the forehead, cheek, and neck, Dr. Carney estimated that the shot had been fired from a distance of anywhere between few inches to two or three feet.

Dr. Jeffrey Neuschatz, a cognitive psychologist, testified for the defense as an expert in eyewitness identification. Dr. Neuschatz said that an eyewitness involved in a violent, stressful situation, such as being assaulted or robbed, had more difficulty remembering things "accurately opposed to a situation when it wasn't a violent event." Additionally, in such a situation identifying a perpetrator was more difficult for an eyewitness.

Dr. Neuschatz stated that when a weapon was involved in an event, an eyewitness's attention was drawn to the weapon and, because of the focus on the weapon, his or her memory of other details suffered. Dr. Neuschatz further stated that research showed that an eyewitness from one race had more difficulty identifying a perpetrator from a different race than a perpetrator from the same race.

On cross-examination, Dr. Neuschatz acknowledged that if an eyewitness had ample time to view a perpetrator clearly, the likelihood of an accurate identification increased.

The jury found the Appellant guilty of the first degree premeditated murder of Mr. Peterson; the felony murder of Mr. Peterson; the attempted first degree murder of Ms. Peterson, a Class A felony; especially aggravated burglary, employment of a firearm during the commission of or attempt to commit a dangerous felony, namely an attempted first degree murder, a Class C felony; and the robbery of Mr. Brown. The trial court merged the felony murder conviction into the premeditated murder conviction. The trial court determined that the Appellant was a Range I, standard offender and sentenced the Appellant to twenty-five years for the attempted first degree murder conviction; twelve years for the especially aggravated burglary conviction; six years for the employment of a firearm during the commission of or attempt to commit a dangerous felony conviction; and six years for robbery.

The trial court ordered the twenty-five-year sentence for attempted first degree murder to be served consecutively to the life sentence for first degree murder, the six-year sentence for employment of a firearm during a dangerous felony to be served consecutively to the twenty-five-year sentence for attempted first degree murder, and the six-year sentence for robbery to be served consecutively to the sentence for employment of a firearm during a dangerous felony. The remaining sentences were to be served concurrently for a total effective sentence of life plus thirty-seven years.

On appeal, the Appellant contends that the trial court erred by allowing the State to introduce the video and photograph of him the police found on YouTube without proper authentication.

## II. Analysis

The Appellant contends that the State "failed to offer even a scintilla of proof to authenticate" an image of the Appellant that was found on a YouTube video. A still photograph was taken from the video. The video and photograph showed the Appellant wearing a distinctive watch that appeared to be the same as the one the perpetrator was

wearing in the security video of Mr. Brown's robbery. The Appellant complains that the State presented "no testimony regarding the ownership of the account from any representative of You[T]ube, when the image was created, how it was created and whether it was a fair and accurate representation of the [Appellant] at the time in which it was taken."

During Detective High's direct examination, he testified that as part of his investigation, he searched for "social media postings made either by or of" the Appellant. At the time of his search, Detective High "kn[e]w what the [Appellant] looked like." Detective High identified a still photograph that was taken from a video the police found posted on YouTube.

Defense counsel objected, contending that the State had not laid a proper foundation for admitting the video and photograph. Defense counsel maintained that the State needed "to establish who actually created or took the picture, who posted the picture, when it was posted, was it altered in any way, is it a fair and accurate depiction of the image shown and without somebody with personal knowledge of that I would submit that it is inadmissible." The trial court overruled the objection but instructed the State "to lay a better foundation of where he found that. . . . How he found it and did he see that himself and is that an accurate image of that . . . and does he know what the [Appellant] looks like."

Detective High asserted that before performing his internet search, he knew what the Appellant looked like. Detective High explained how he searched social media:

> So we had a name, part of our investigation is trying to find out any social media contacts or any activity on the internet. It has been my experience that people are very social. Everyone has a cell phone. In fact, there is more cell phones now than there are people on the planet, so they are very social.
>
> Most every person has a social media account, either Twitter, Facebook, YouTube, Instagram, some type of social media account, so one of the avenues that we will go through in an investigation is a search for social media postings either on YouTube or Facebook or Instagram, Twitter or things like that and that is what we did. There were several of us working on this and I happen[ed] to come across this video.

- 13 -

Detective High said that once he saw the video, he recognized the Appellant. The video and photograph taken from the video were shown to the jury. Detective High said that the video was notable because the Appellant was wearing a watch that was similar to the watch the perpetrator was wearing in the security video of the robbery of Mr. Brown. Detective High said that he did not know when the video was posted to YouTube, explaining that "from what I remember it was posted earlier that year, within the same, 2014, but I don't remember when."

The Appellant contends that the video and photograph were not properly authenticated. Tennessee Rule of Evidence 901 governs the authentication of evidence. Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Whether evidence has been sufficiently authenticated is within the trial court's sound discretion, and its decision will not be overturned absent an abuse of discretion. See State v. Mickens, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003).

"A trial court has broad discretion regarding the admissibility of photographs [and videos]." State v. Davidson, 509 S.W.3d 156, 198 (Tenn. 2016) (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978)). "Before a photograph is admissible, it must be verified and authenticated by a knowledgeable witness." Id. (citing Banks, 564 S.W.2d at 949). A leading treatise has explained that "[v]ideos . . . are authenticated the same way as photographs." Neil P. Cohen et al., Tennessee Law of Evidence, §9.01[3][c] (6th ed. 2011). Generally, "[a] photograph can b[e] authenticated by proof that it depicts what it is claimed to depict, Rule 901(a)." Id. § 4.01[21][e] (6th ed. 2011). However,

> [i]t is not necessary . . . that the witness through whom a photo is being introduced was also the photographer who took the photo in question. Any person, whether or not the photographer, familiar with the place or item that was photographed can authenticate the picture by testifying that it is a true and accurate depiction of the location or item at issue in the case.

Id.

The Appellant contends that this issue is controlled by State v. Jabriel Linzy, No. E2016-01052-CCA-R3-CD, 2017 WL 3575871 (Tenn. Crim. App. at Knoxville, Aug. 18, 2017), perm. to appeal denied, (Tenn. Nov. 16, 2017). In Linzy, the State sought to introduce messages found on Facebook and Twitter that reflected the defendant and the victim were members of rival gangs and that the defendant had issued threats against the

- 14 -

victim. Id. at *13. The defendant argued that the comments could not be attributed to him; in other words, the comments could not be authenticated. Id. at *11. This court stated that "evidence from social media and emails was authenticated when the prosecution offered corroborating circumstantial evidence." Id. at *12. The corroborating circumstantial evidence consisted of a witness who knew the defendant's Twitter account, a witness who knew the victim's Twitter account, and witnesses who had seen certain photographs on the defendant's and the victim's Facebook pages. Id. at *13. However, we cautioned that "'[t]o the extent that the [d]efendant argues that the State was required to affirmatively prove that the [d]efendant was the author of the message, we agree with reasoning from other jurisdictions that such challenge goes to the weight of the evidence, not its admissibility.'" Id. at *12 (quoting State v. Vermaine M. Burns, No. M2014-00357-CCA-R3-CD, 2015 WL 2105543, at *12 (Tenn. Crim. App. at Nashville, May 5, 2015)).

The instant case is distinguishable from Linzy. The State did not attempt to attribute any messages to the Appellant; instead, the Detective High, who knew what the Appellant looked like, found an image of the Appellant on a YouTube video, took a still photograph from the video, and introduced the video and the photograph to corroborate Mr. Brown's identification of the Appellant as the perpetrator who robbed him.

Although our courts have not yet addressed how to analyze the authentication of photographs or videos taken from social media for admission at trial, this court recently addressed whether the authentication of a Facebook video was sufficient for admission during a sentencing hearing. In State v. Shandejah Andrea Stone, No. M2018-01519-CCA-R3-CD, 2020 WL 401857, at *1 (Tenn. Crim. App. at Nashville, Jan. 24, 2020), the defendant contended on appeal that the Facebook video was not properly authenticated, arguing "that its authentication had to be established by a Facebook representative or by Defendant." The video, which showed the defendant talking about various matters and demonstrating her "significant anger issues" and "willing[ness] to get vengeance," was pertinent to various sentencing issues. Id. at *2. This court noted that the trial court saw the defendant at trial, heard her trial testimony, and saw her again at the sentencing hearing. Id. at *3. This court held that

> [t]he pertinent factual findings made by the trial court, based in part on what it observed in the video, related to what Defendant said in it. Information as to the video having been distributed via any social media, who may have distributed the video, and who may have previously seen it was not necessary for the ultimate use of the video as evidence. The video was thus properly authenticated . . . .

Id.

Moreover, other jurisdictions have considered the issue. The Fourth Circuit has stated that "authentication of social media evidence is a case-specific issue." State v. Gerard Gray, __ So. 3d __, No. 2016-KA-1195, 2017 WL 3426021, at *14 (La. Ct. App., June 28, 2017), writ denied, 257 So. 3d 688 (La. 2018). "'Consequently, the type and quantum of evidence will depend on the context and the purpose of its introduction. Evidence which is deemed sufficient to support a reasonable juror's finding that the proposed evidence is what it is purports to be in one case, may be insufficient in another.'" Id. (quoting State v. Smith, 192 So. 3d 836, 842 (La. Ct. App. 2016)). In Gray, the court concluded the defendant's "argument that there was no authentication evidence as to when the three YouTube videos were recorded and posted or who posted the videos addresses the reliability and the weight of the video evidence, not the authenticity." Id. at *16. The court explained that "the testimony of a witness with personal knowledge may provide the authentication of evidence necessary for its admission" and held that a detective's testimony was sufficient for the lower court to find that YouTube videos were what the State claimed them to be. Id.

The Sixth Circuit has explained that "[a]uthentication does not require *certain* proof, but rather only enough proof 'so that a reasonable juror could find in favor of authenticity.'" United States v. Thomas, 701 F. App'x 414, 418 (6th Cir. 2017) (emphasis in original) (quoting United States v. Jones, 107 F.3d 1147, 1150 n.1 (6th Cir. 1997)). The Sixth Circuit found "no reason to depart from the ordinary rule that photographs, including social-media photographs, are authenticated by 'evidence sufficient to support a finding that the [photograph] is what the proponent claims it is.'" Id. (quoting Fed. R. Evid. 901(a)). Notably, the Sixth Circuit has stated that "it is not at all clear . . . why our rules of evidence would treat electronic photos that police stumble across on Facebook one way and physical photos that police stumble across lying on a sidewalk a different way." United States v. Farrad, 895 F.3d 859, 879-80 (6th Cir. 2018) (holding that a court committed no abuse of discretion by admitting Facebook photographs when sufficient evidence existed that the photographs were what they were claimed to be).

In United States v. Vazquez-Soto, 939 F.3d 365, 372 (1st Cir. 2019), the First Circuit analyzed whether photographs of Vazquez-Soto engaging in strenuous activity after that he claimed to be disabled were sufficiently authenticated. The photographs were found on the Facebook page of Vazquez-Soto's ex-wife. Id. at 373. The court stated that

> [t]he authenticity of [the] social media account is not at issue
> in this case -- that is, the account's ownership is not relevant.

> The photographs were introduced as images of Vazquez-Soto on a motorcycle trip, not as part of a social media statement by [his ex-wife]. Thus, what is at issue is only the authenticity of the photographs, not the Facebook page.

Id. The First Circuit concluded that the government offered sufficient evidence to authenticate a photograph taken from Facebook when an agent testified that he knew what Vazquez-Soto looked like and that he recognized Vazquez-Soto in each photograph. Id. at 374.

Generally, "[e]vidence may be authenticated by its 'appearance, contents, substance, internal patterns, or other distinctive characteristics . . . taken together with all the circumstances.'" United States v. Broomfield, 591 F. App'x 847, 851 (11th Cir. 2014) (quoting Fed. R. Evid. 901(b)(4)); see Tenn. R. Evid. 901(b)(4). Further, "[a]uthentication may be established 'solely through the use of circumstantial evidence.'" Id. (quoting United States v. Smith, 918 F.2d 1501, 1510 (11th Cir. 1990)). Specifically discussing the authentication of a YouTube video, a Florida District Court of Appeal stated that "requir[ing] the state to provide testimony from the defendant, codefendants, or other witnesses who appear in the video, or from someone who recorded the video, sets the authentication burden too high." Lamb v. State, 246 So. 3d 400, 409 (Fla. Dist. Ct. App. 2018) (citing Broomfield, 591 F. App'x at 852). Instead, the court

> permitted the admission of social media videos in criminal cases based on sufficient evidence that the video depicts what the government claims, even though the government did not: (1) call the creator of the videos; (2) search the device which was used to create the videos; or (3) obtain information directly from the social media website.

Id.; see Jordan v. State, 212 So. 3d 836, 845 (Miss. Ct. App. 2015) (holding that an investigator had sufficient knowledge to authenticate a video by testifying video was what State claimed it to be and that any challenges regarding lack of knowledge about who produced video or when it was made went to weight, not admissibility).

In the instant case, Detective High testified that he knew what the Appellant looked like. After performing an internet search, Detective High found a YouTube video featuring the Appellant, who was wearing a distinctive watch that appeared to be the same as the watch the perpetrator was wearing in the security video of Mr. Brown's robbery. Detective High further testified that the police downloaded a copy of the YouTube video and made a still photograph from the video. We conclude that Detective High's testimony was sufficient to authenticate the video and the photograph. Any

further argument the Appellant had regarding the ownership of the account, when or how the image was created, or whether it was a fair representation of the Appellant at the time it was taken goes to the weight the jury attributed to the images, not their authenticity. See Jordan, 212 So. 3d at 845; Gray, No. 2016-KA-1195, 2017 WL 3426021, at *16. We conclude that the trial court did not abuse its discretion by admitting the video and the photograph.

### III.  Conclusion

Finding no error, we affirm the judgments of the trial court.

_____

NORMA MCGEE OGLE, JUDGE